Kenneth VODOCHODSKY, Appellant,

v.

The STATE of Texas.

No. AP–74129.

Court of Criminal Appeals of Texas.

March 16, 2005.

---

6. *McNairy v. State,* 835 S.W.2d 101, 106 (Tex. Crim.App.1991).

7. *Ibid.*

8. *Id.,* at 107.

Richard E. Langlois, San Antonio, for Appellant.

Jennifer Beldon Rosenblatt, Assist. DA, San Antonio, Matthew Paul, State's Attorney, Austin, for State.

## OPINION

KEASLER, J., delivered the opinion of the Court in which PRICE, WOMACK, JOHNSON, and HOLCOMB, JJ., joined.

We withdraw our previous opinion and substitute this one. We deny the State's motion for rehearing.

In February 2001, a jury convicted Kenneth Vodochodsky of killing a peace officer who was acting in the lawful discharge of an official duty.[1] Pursuant to the jury's answers to the special issues set forth in Texas Code of Criminal Procedure Article 37.071, §§ 2(b) and 2(e), the trial judge sentenced Vodochodsky to death.[2] Direct appeal to this Court is automatic.[3] Vodochodsky raises four points of error. We sustain his second point of error, which alleges that the evidence is factually insufficient. We reverse his conviction and sentence.

## A. The Victims

In the early evening hours of October 12, 1999, Atascosa County Sheriff's Deputies Thomas Monse and Mark Stephenson and Texas Department of Public Safety Trooper Terry Miller were ambushed and killed by multiple gunshots. Monse died from eighteen gunshot wounds caused by rifle, shotgun, and handgun fire. Two of his wounds were caused by close range handgun fire to his face. Stephenson died from eleven gunshot wounds caused by rifle and handgun fire. Stephenson also had wounds which were caused by close-range handgun fire to his face. Miller received two wounds from rifle fire. The shot through his head killed him. Several other officers involved in the conflict were also injured.

At the end of the incident, the shooter, Jeremiah Engleton, killed himself with a gunshot wound to his head. Near his body lay an SKS Norenco 7.62 × 39mm semiautomatic rifle, a Mossberg 12–gauge pump-action shotgun, a Ruger 9mm semiautomatic handgun, and a Glock .40–caliber semiautomatic handgun. The police also found a Lorcin .380–caliber semiautomatic handgun in Engleton's pants' pocket and a suicide note in his right shoe.

Vodochodsky was subsequently indicted for intentionally or knowingly causing Monse's death by shooting him with a firearm. The indictment further charged that "the said Thomas Monse was then and there a peace officer ... who was acting in the lawful discharge of an official duty, and [Vodochodsky] knew Thomas Monse was a peace officer." At trial, the jury was instructed on the law of parties and authorized to find Vodochodsky guilty if they found that he acted "with intent to promote or assist Jeremiah Engleton to commit the offense of capital murder, and did then and there solicit, encourage, direct,

---

1. TEX. PENAL CODE ANN. § 19.03(a)(1).

2. Art. 37.071, § 2(g). Unless otherwise indicated this and all future references to Articles refer to the Code of Criminal Procedure.

3. Art. 37.071, § 2(h).

aid or attempt to aid Jeremiah Engleton to commit the offense...."

## B. The Crime Scene

Jeremiah Engleton, his wife Violet, their infant daughter, Violet's sister Sara Lopez, her two children, and her boyfriend Kenneth Vodochodsky (who had been Engleton's friend since they were small boys) lived in a three-bedroom home in rural Atascosa County just east of Pleasanton. A thickly overgrown field surrounded by a barbed-wire fence sits across Corgey Road to the north of the residence. Two driveways enter the property-from Corgey Road to the north and from Coughran Road to the west. In the field to the north of Corgey Road, the barbed wire fence had been cut, apparently to facilitate the shooter's movement between the field and the residence. The field was littered with over a hundred spent rifle and shotgun casings, and the police found several locations in the field that appeared to be shooting positions.

Monse and Stephenson were gunned down near their vehicles at the north end of the residence. Miller was shot as he backed his vehicle away from the residence. Others were wounded as they stood behind Miller's vehicle trying to assess the situation.

## C. The Sequence of Events

On October 11, 1999, Engleton came home late in the evening and immediately got into an argument with Violet. He struck her and pointed a gun at her head. Around midnight, in response to Engleton's violent behavior, Violet called the Atascosa Sheriff's Office, and Deputy Monse was dispatched to their residence. About the time Monse was exiting his vehicle, Engleton asked Vodochodsky, "Do you remember what we've been talking about? I'm going to do it right now." According

to Sara, Vodochodsky replied, "No, it's not worth it." Sara testified that she didn't ask any questions because she "didn't want to hear the answers." She "felt" that Vodochodsky knew something but she "didn't want to hear it out of his mouth." Monse then arrested Engleton but allowed him to leave Vodochodsky his wallet and $1,000.00 to bail him out the next day. Engleton was booked into jail at 1:10 a.m. on October 12, 1999.

Later that morning, Engleton commented to his cellmate, Orlando Garcia, that "[t]hese motherfuckers don't know what they got coming," and that it was going to make the front page. Garcia also overheard a telephone call Engleton placed to Vodochodsky, during which Engleton told Vodochodsky to make sure that Violet did not take his "SK" (an SKS Chinese-or Russian-made semi-automatic assault rifle) or his "nine" (a 9 millimeter semiautomatic pistol). Engleton also told cellmate Phillip Darrah that he had been arrested for domestic violence and that when he got out he "had plans and planned to make some headlines." Darrah also overheard a telephone conversation between Engleton and Vodochodsky during which Engleton asked Vodochodsky to take care of his belongings and specifically mentioned the "SK." Engleton also told Vodochodsky to bring the $1,000.00 he left him to make his bail.

While Engleton sat in jail, Sara and Violet moved some of Violet's property into a storage facility and obtained a restraining order requiring Engleton to vacate the residence by 5:00 p.m. that evening. Shortly after noon, they packed up more of Violet's property and left for Vodochodsky's parents' house in nearby Floresville.

At 2:12 p.m., Vodochodsky posted Engleton's bail. Between 3:30 and 4:30 p.m., the two men went to a Pleasanton gun shop where Engleton purchased several

boxes of ammunition. Wayne Balzen testified that he was working at the gun shop the day that Engleton and Vodochodsky came in to buy ammunition. He testified that they came in together but Engleton asked for the ammunition while Vodochodsky was farther down the counter, "peering and looking at guns." Engleton asked for a number of different kinds of ammunition, including some "softnose" rounds. Balzen testified that "hardnose" rounds are generally used for target shooting and "softnose" rounds are primarily for hunting. He also testified that Engleton asked for "subsonic" ammunition, which is special because it is "loaded with hydroshock bullets" and is primarily used by law enforcement.

After purchasing the ammunition, Vodochodsky and Engleton returned to their residence. Around 5:30 p.m., Sara called the house and Vodochodsky told her that Engleton had left. Sara, Violet, and Vodochodsky's brother Anthony then left Floresville and drove toward the residence. When they arrived, they saw Engleton's vehicle and continued on to a grocery store in Pleasanton. Sara then called Vodochodsky again. At first Vodochodsky acted like he was angry because they had not shown up, but then he dropped his voice to a whisper and told Sara not to come home. Instead, he told Sara that he would meet her at Anthony's house later. Sara and Anthony left Violet with a friend and went to Anthony's house. After that, the events occurred in the following order:

7:45 p.m. A neighbor, Edward Essary, drove past Vodochodsky's residence on his way to Wal–Mart. As he passed the residence, he saw Vodochodsky loading "stuff" into his vehicle.

8:07 Police received a "911" call to the Atascosa County Sheriff's Office from Engleton's home. Vodochodsky was still at the residence.

8:13 Monse and Stephenson were dispatched to the residence.

8:28 Monse arrived at the residence and apparently was immediately shot and killed from a position about 75 feet away, from the field across Corgey Road from the Engleton residence.

8:30 Stephenson arrived.

8:31 Stephenson very faintly radioed in that he had been hit. At approximately this same time, Vodochodsky's neighbor, Robert Hutton, heard several gunshots. As he sat in his car at the adjacent intersection, Hutton saw two patrol cars on Vodochodsky's property with their headlights on. He also noticed that the security light in the back of the residence was off. Further, Hutton noticed a flashlight moving on top of Vodochodsky's residence and concluded that a person was walking around on the roof. He noted that the individual was on the backside of the pitched roof near the north end of the residence overlooking the deputies' vehicles. Later, seven fresh shell casings were found behind the house, close enough to the house that it appeared that they had rolled off the roof. After 45 seconds to a minute, Hutton drove away.

8:37 Miller was dispatched to the residence to check on Monse and Stephenson because they could not be reached by radio. Also around this time period, but before Miller arrived at the residence, Essary returned from Wal–Mart. As he passed Vodochodsky's home, he noticed the two deputies' vehicles in Vodochodsky's north driveway. After arriving home and putting away his purchases, Essary became concerned about the events at Vodochodsky's house. He

then got back in his car and drove toward the house.

8:51　Miller arrived at the residence.

8:52　Miller radioed in "officer down" and requested assistance. As Miller was backing away from the residence in his vehicle, he was shot and killed while still in his vehicle. As Essary approached Vodochodsky's house, he saw a highway patrol vehicle backing away from the residence and heard gunfire. As Essary passed the residence, he saw a flashlight on the ground at the north end of the residence. Essary turned the corner and made his way to another neighbor's house.

8:56　Pleasanton Police Department Officer Louis Tudyk arrived at the intersection adjacent to the house. He parked his vehicle behind Miller's vehicle.

8:57　Retired United States Border Patrol Special Agent Carl Fisher pulled his truck up alongside Tudyk's vehicle.

8:58　Tudyk and Fisher were shot and wounded.

9:00　Vodochodsky arrived at Anthony's house, which is located 21.7 miles from his own. He told Anthony that he drove straight there from his house, a trip which should take 21 to 23 minutes depending upon speed and traffic. Vodochodsky told Sara that Engleton was going to kill himself, and that he wanted to watch the news. Sara told Vodochodsky that Engleton's suicide would not be on television. Sara wanted to go to the residence to help Engleton, but Vodochodsky did not want to go. Over Vodochodsky's objection, Sara called Violet to tell her that Engleton planned to kill himself. Vodochodsky eventually agreed to go to the residence.

10:47　Vodochodsky and Sara arrived at one of the roadblocks attempting to get to the residence, but they were not allowed through. They then went to pick up Violet and returned to Anthony's house. After arriving at Anthony's house, Vodochodsky gave Violet a farewell letter from Engleton. Throughout this time period, many other officers arrived at the residence and took part in the standoff. Finally, with the help of officers in a San Antonio Police Department helicopter, ground officers pursued Engleton. Before they reached him, Engleton shot himself in the head and died.

Either the night of the killings or the next day, October 13, Vodochodsky admitted to Sara that he was at the residence when the bogus 911 call was made, but he denied making it himself. Around 2:00 p.m. on October 13, Vodochodsky spoke with Texas Ranger Tony Leal about the events of the previous day. Vodochodsky told Leal that he left his house at 8:00 p.m. the previous evening and drove directly to his brother's house in Poteet. Vodochodsky also indicated to Leal that he did not know about Engleton's plans regarding the night of the murders.

Around 1:00 p.m. on October 14, Vodochodsky talked to Essary about the killings. During this conversation, Essary showed Vodochodsky where he had seen the flashlight the night of the killings. In response, Vodochodsky stated, "Yeah, that's where one of the pigs—that's probably where one of the pigs got shot at." Vodochodsky also told Essary that he bailed Engleton out of jail "[t]o do this." Essary unequivocally told the jury that Vodochodsky made the statement in a tone that indicated that he was proud of his actions.

Vodochodsky told Essary that Engleton wanted to do this the night that the police

came to arrest him for assaulting Violet, but Vodochodsky told Engleton, "No, . . . we ain't got nothing planned yet." Vodochodsky told Essary that Engleton was going to kill himself and "take some pigs with him." Vodochodsky then stated that "that would be less pigs in the world." Vodochodsky told Essary that, after he bailed Engleton out, the two of them went to the gun store and bought "$200 worth of the best ammo." He said that, after they returned home, Engleton kept four guns and Vodochodsky loaded the rest in his car as well as some other items "because the police were coming and he took the stuff that they would confiscate." Along with other weapons, Vodochodsky also took some tools, the "papers" to the house, and the "papers" to Engleton's boat. When Essary commented about how the police cut up the fence across the street, Vodochodsky responded, "No, that's where [Engleton] cut it up" and "that's where he was shooting at." Vodochodsky further commented to Essary that he knew that Engleton had gone "over the edge" when he took the deputy's gun. He also told Essary that he was still at the house when Engleton made the 911 call.

Lisa Sandberg, a reporter for the San Antonio Express News, testified that she interviewed Vodochodsky in the spring of 2000. During that interview, he told her that Engleton had been very upset about his arrest and at one point had said that he wanted to kill some deputies. Vodochodsky said that he had not taken Engleton seriously and had told him, "Don't worry about it. I'll get you out of jail." He said that he had told Engleton, "it's not worth it." Vodochodsky told Sandberg that, after he bailed Engleton out of jail, they had gone "to a gun shop where they bought ammunition" to use at a firing range. Vodochodsky also told Sandberg that he had not had any "prior knowledge" of Engleton's "plan" and that he had had no idea

that Engleton "would use the more than 300 rounds of ammunition to fatally shoot the officers." Vodochodsky told Sandberg that he left the residence at 7:45 p.m. on the night of the murders. Sandberg also testified that, when she was interviewing him, Vodochodsky asked her what section of the newspaper the article would appear in. When she told him that it might appear on the front page, Vodochodsky said that that was interesting.

Violet Engleton testified that she, Engleton and Vodochodsky watched the movie "Set it Off" often, and that they all liked it. In that movie, she testified, four girls rob a bank and then die in a shoot-off with police officers. She testified that Engleton said that that is the way that he would like to die. Sara Lopez also testified that Engleton and Vodochodsky watched that movie a lot. She testified that when she watched "Set it Off" with Engleton, he told her that "if he was ever wanted by the law, that's how he would go out" and that Vodochodsky "said the same thing."

Some time after Vodochodsky was incarcerated, jail personnel found in his possession a note containing numbers and simple mathematical calculations. Beside one number was the word "bond" and beside another number was the word "bullets."

### D. Analysis

In his first point of error, Vodochodsky asserts that the evidence is legally insufficient to support the jury's verdict of guilty of capital murder. In his second point, he asserts that the evidence is factually insufficient. As previously noted, Vodochodsky was indicted for intentionally or knowingly causing the death of Thomas Monse, a person he knew to be a peace officer acting in the lawful discharge of his duty, by shooting him with a firearm. After the presentation of evidence, the court

charged the jury that it could find Vodochodsky guilty if it found that he acted with the intent to promote or assist Engleton in committing the offense of capital murder, and Vodochodsky did then and there solicit, encourage, direct, aid or attempt to aid Engleton in committing the offense. It is well settled, and Vodochodsky does not contest the rule, that the law of parties need not be pled in the indictment.[4] Further, Vodochodsky does not challenge the fact that Engleton intended to kill a peace officer who was acting in the lawful discharge of his duties. Instead, Vodochodsky contends that he was merely present at the scene and, therefore, cannot be held responsible for Engleton's acts.

In reviewing the legal sufficiency of the evidence, this Court looks at all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt.[5] In determining whether evidence is sufficient to convict, we must examine the totality of the circumstances.[6] Texas Penal Code § 7.01(a) states that "[a] person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both." A person is criminally responsible for the conduct of another if "acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense[.]"[7]

A rational jury could conclude from this evidence that Vodochodsky was present during the shoot-out and that he participated in part of it. The evidence established that Engleton was shooting from the field across Corgey Road, approximately 75 feet away, while another person was shooting from the roof of the house. Vodochodsky's statements about when he left the house were inconsistent-he told Sandberg and Leal that he left before the 911 call was made, but admitted to Sara and Essary that he left after the 911 call had been made. He told Anthony that he had driven from his house directly to Anthony's house, but it is only a 23–minute drive and he arrived at Anthony's house at 9:00 p.m. Vodochodsky was also inconsistent about whether he was aware of the plan to murder police officers, telling Sandberg and Leal that he was unaware of the plan but telling Sara and Essary that he knew of the plan.

The night before the offense, Engleton expressed a desire to "do it right now" and Vodochodsky told him they did not yet have a plan. A rational jury could conclude from this evidence that Engleton had a plan to kill a peace officer, that Vodochodsky was aware of Engleton's plan, and that Vodochodsky wanted to wait until the plan was foolproof. On the day of the crime, Vodochodsky bailed Engleton out of jail, later telling Essary that he bailed him out "to do this." A rational jury could conclude from this evidence that Vodochodsky bailed Engleton out of jail specifically to carry out the plan to kill peace officers.

4. *Marable v. State*, 85 S.W.3d 287 (Tex.Crim. App.2002)(and cases cited therein).

5. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Griffin v. State*, 614 S.W.2d 155, 159 (Tex.Crim.App.1981).

6. *See Denton v. State*, 911 S.W.2d 388, 389–90 (Tex.Crim.App.1995); *Miller v. State*, 667 S.W.2d 773, 776 (Tex.Crim.App.1984); *Rucker v. State*, 599 S.W.2d 581, 591 (Tex.Crim. App.1979); *Reynolds v. State*, 506 S.W.2d 864, 867 (Tex.Crim.App.1974). *See also Garcia v. State*, 887 S.W.2d 862, 870 (Tex.Crim. App.1994).

7. Tex. Penal Code § 7.02(a)(2).

Knowing that the police were coming and knowing that Engleton intended to commit suicide after his killing spree, Vodochodsky took many items from the house. A rational jury could conclude from this evidence that Vodochodsky sought to help Engleton wrap up his affairs as part of his participation in the plan. Finally, Vodochodsky commented to Essary after the crime that he knew that Engleton had "gone over the edge" when he took the deputy's gun. A rational jury could conclude from this evidence that Vodochodsky was still at the residence and witnessed at least Monse's murder, despite any claims to the contrary.

In light of this evidence, we hold that a rational jury could have found beyond a reasonable doubt that Vodochodsky acted with an intent to promote or assist Engleton in committing this offense. Point of error one is overruled.

 In a factual sufficiency review, we view all the evidence in a neutral light, both for and against the finding, and set aside the verdict if "proof of guilt is so obviously weak as to undermine confidence in the jury's determination, or the proof of guilt, although adequate if taken alone, is greatly outweighed by contrary proof."[8] In conducting such a review, we consider all of the evidence weighed by the jury, comparing the evidence which tends to prove the existence of the elemental fact in dispute to the evidence which tends to disprove it.[9] We are authorized to disagree with the jury's determination even if probative evidence exists which supports the verdict, but we must avoid substituting our judgment for that of the fact-finder.[10]

In this case, the overwhelming weight of the evidence mitigates against the conclusion that Vodochodsky solicited, encouraged, directed, aided or attempted to aid Engleton in committing the offense. All of the evidence that could legally support a rational jury's conclusion is nevertheless so weak that our confidence in the jury's verdict is undermined. Although there was some evidence of a second shooter on the roof, this was not established. While Vodochodsky's statements were inconsistent, the inconsistencies were minor. When Engleton expressed a desire to "do it right now" and Vodochodsky told him they did not yet have a plan, neither man specifically mentioned killing a peace officer. When Vodochodsky told Essary that he bailed Engleton out of jail "to do this," he did not specifically state that he bailed him out as part of a plan to kill police officers. Vodochodsky removed belongings from the house, but there is no proof that he did so as part of a murderous plot. And Vodochodsky's comment to Essary that Engleton had "gone over the edge" when he took the deputy's gun could just as reasonably have been a speculative comment, not one indicating that Vodochodsky had witnessed Monse's murder.

Indeed, none of that evidence necessarily suggests that Vodochodsky acted with intent to promote or assist Engleton. None of his statements directly refer to killing police officers. His statements are devoid of information on the details of the alleged murder plot, and there is no other information in the record suggesting that Vodochodsky was planning the event with Engleton.

Furthermore, other evidence suggests that Vodochodsky was not working with

---

8. *Johnson v. State,* 23 S.W.3d 1, 11 (Tex.Crim. App.2000); *see also Goodman v. State,* 66 S.W.3d 283, 285–86 (Tex.Crim.App.2001).

9. *Johnson,* 23 S.W.3d at 7.

10. *Id.; Santellan v. State,* 939 S.W.2d 155, 164 (Tex.Crim.App.1997).

Engleton. His whispered warning to Sara could indicate that while he may have known of Engleton's plan, he was not a party to it. He did not participate in the purchase of ammunition. There is no evidence that Vodochodsky actually did any affirmative act to assist Engleton with the plan. Instead, Vodochodsky had the bad luck of being the friend and roommate of a man determined to kill police officers and himself.

We conclude that proof of Vodochodsky's guilt was so weak as to undermine confidence in the jury's determination. This evidence was factually insufficient to convict. Point of error two is sustained.

We reverse the judgment of the trial court and remand this case for Vodochodsky to answer the charges in the indictment.

KELLER, P.J., filed a dissenting opinion in which MEYERS, J., joined.

COCHRAN, J., filed a concurring opinion.

HERVEY, J., did not participate.

KELLER, P.J., filed a dissenting opinion in which MEYERS, J., joined.

The Court withdraws its opinion on original submission and substitutes an opinion that addresses matters raised in the State's motion for rehearing, and the Court denies rehearing. I believe the better course would be to grant rehearing before issuing the new opinion, but in keeping with the Court's action, I withdraw my previous opinion and substitute this one.

Two things are basically required to establish liability as a party under § 7.02(a)(2): (1) intent to promote or assist the offense and (2) an act that solicits, encourages, directs, aids, or attempts to aid in the commission of the offense.[1] Both of these elements are shown in the present case. Appellant's culpable intent was shown by his own admissions. According to Essary, on the night of Engleton's arrest, appellant told Engleton not to do anything because "we don't have anything planned yet." Appellant admitted to his girlfriend and to Essary that he knew, before the events, that Engleton was going to commit suicide and kill police officers. His girlfriend's testimony further shows that appellant saw Engleton's guns laid out in preparation for this event. Essary's testimony indicates that appellant was present when Engleton made the 911 call and that appellant also knew that Engleton had cut the fence. Essary also testified that appellant said he bailed Engleton out of jail "to do this" and that appellant sounded proud when he said it. When challenged by defense counsel on whether appellant could have been in shock when he made that statement, Essary maintained that appellant said it proudly.

Appellant's admissions and circumstantial evidence indicate that appellant performed acts that encouraged or aided the commission of the crime. Essary testified that appellant "Said *they* went to the gun store and bought $200 worth of the best ammo." That testimony indicates that appellant was a participant in buying the ammunition even if that participation was not apparent to the proprietor of the store. That appellant participated in buying the ammunition is also supported by a handwritten note retrieved by the jail librarian from a book appellant had checked out and later turned in. This note contained numbers that added up to $2000, including

---

[1] "A person is criminally responsible for an offense committed by the conduct of another if ... acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense."

$200 for bond and $200 for bullets. The evidence also indicated that appellant was with Engleton for several hours. When talking about that time to Ranger Antonio Leal, appellant became nervous and asked for a cigarette. He told Leal that he and Engleton watched "Saving Private Ryan," starting at 5:30, but Leal thought that was unlikely because the movie was three hours long. From appellant's admitted knowledge of Engleton's activities and his attempts to cover up his own involvement, the jury could have rationally inferred that appellant participated in helping Engleton set up the scene for the subsequent confrontation.

Moreover, there is circumstantial evidence that appellant was still at the scene when deputies Monse and Stephenson were killed. Appellant told Essary that Engleton made a mistake in taking Deputy Monse's gun—a fact that, two days after the offense—did not appear to be widely publicized. Moreover, at least one officer testified that it takes approximately twenty-three minutes to drive from Engleton's residence to Anthony Vodochodsky's residence. There was evidence that appellant arrived at Anthony's residence at approximately 9:00 p.m. Since the deputies arrived at 8:28 and 8:30, and their murders occurred shortly after that, appellant could have observed or even participated in those events. At about that time, a passerby saw on the roof a shining flashlight, which could have been carried by appellant. Because Trooper Miller did not arrive until 8:51, there could have been as much as twenty minutes after the deputies' deaths before appellant left the scene of the crime.

In its motion for rehearing, the State points out the irony of this Court's conclusion that appellant's warning to Sara to stay away was exculpatory, indicating that "while he may have known of Engleton's plan, he was not a party to it," [2] when just two weeks later we cited a similar warning as evidence supporting a capital murder conviction.[3]

I believe the evidence was legally and factually sufficient to support the conviction. I respectfully dissent from the Court's judgment reversing the conviction and from its decision to deny the State's motion for rehearing.

COCHRAN, J., filed a concurring opinion.

I join all of the Court's opinion except the paragraph on page 509 beginning with the sentence, "A rational jury could conclude from this evidence that Vodochodsky was present during the shoot-out and that he participated in part of it." I do not believe that a rational jury could conclude that appellant, Kenneth Vodochodsky, was present during any part of the shoot-out. Here is why.

It is undisputed that appellant was present at the time the bogus 911 call was made, but I believe that the record is clear that appellant was *not* present at the time of any of the killings. No witness and no physical evidence places appellant at Engleton's residence at the time Deputy Monse was killed. And the evidence shows that it was nearly impossible for him to have been present.

George Gorman, Jr., one of Engleton's neighbors, returned home after visiting with a neighbor sometime between 8:15

2. *Vodochodsky v. State*, 2004 WL 840121, 2004 Tex.Crim.App. LEXIS 663, at 18 (April 21, 2004); *see also* Court's op. at 511.

3. *Ross v. State*, 133 S.W.3d 618, 621 (Tex. Crim.App.2004). Ross did not have an ac-

complice, but that factual difference does not seem to me to be sufficient to convert a plainly incriminating fact into an exculpatory fact.

and 8:28 p.m. Gorman saw Deputy Monse turn onto Engleton's property. Minutes later, he saw Deputy Stephenson turn onto the property. Gorman did not see appellant's car. Judging from the State's numerous diagrams and photographic exhibits showing the intersection, the corner property, the position of the trailer, and the lack of trees or other foliage on the property, if appellant's car were still at the trailer, Mr. Gorman would have seen it in the headlights of both of the patrol cars.

Similarly, Robert Hutton was unable to place appellant at Engleton's residence at the time Deputy Monse was killed. Hutton testified that he went outside to play with his dogs for a couple of minutes—"a little bit after 8:00 p.m." According to Hutton's testimony, he heard gunfire "[r]ight after [he] got outside." [1] Hutton said that when he drove past Engleton's trailer shortly after Deputy Stephenson had arrived (only two minutes after Deputy Monse had arrived), he looked at the trailer for approximately 45 seconds to one minute and saw that the headlights of both patrol cars had lit up the front of the house.

Mr. Hutton testified that, although he saw only the two patrol cars in the front yard, he had seen a flashlight moving around on the back of the trailer roof between 8:30 and 8:33 p.m.[2] Perhaps he did, but there is no evidence that this person could have been appellant rather than Engleton. Spent casings were found on the ground near the trailer that might have been consistent with a shooter on the roof. Those casings were .9 mm and .380 casings.[3] Nine millimeter and .380 handguns were found next to Engleton's body when he later killed himself in the open field across the road.

Jesus Garza, another neighbor of Engleton's, could not place appellant's car at the trailer at the time Deputy Monse was killed. Mr. Garza testified that he saw appellant pull Engleton's blue Monte Carlo up to the front of the trailer, where appellant's car was parked, sometime between 8:00 p.m. and 8:15—right before Mr. Garza went inside to take a shower. When he finished his shower, Mr. Garza heard noises outside and saw the deputies' cars over near the trailer. He did not see the blue Monte Carlo or any other car except those of the deputies. Not hearing anything more, he went back inside, but came out again when he heard the highway patrol car coming up Corgey Road.

Alex Sanchez, another neighbor, testified that he could see the front of Engleton's trailer and saw only the two patrol cars.

Like George Gorman, Robert Hutton, Jesus Garza, and Alex Sanchez, Edward Essary saw many of the events before, during, and after the murders. Mr. Essary, a tank commander in Saudi Arabia

---

1. Mr. Hutton may have been a little confused about the timing because Deputy Monse was not killed until 8:28 p.m. and Deputy Stephenson was not shot until 8:31 p.m.

2. After the murders, the State undertook a "thump test" in which one officer tossed casings into the air while standing on Engleton's trailer roof to see whether those casings, had they been ejected from one of the murder weapons, might have hit the roof and rolled down to land near the back door where numerous spent casings were found. The result

of that "thump test" was that it was possible. Commendably, the State admits that "[t]here is no evidence that the dead and wounded individuals were actually shot from a position on the rooftop."

3. Spent .9 mm and .380 casings were found all over Engleton's property as he frequently shot his guns around his trailer. Crime scene investigators did not collect or preserve any of the casings that appeared old, tarnished, or were partly buried in the dirt.

during Desert Storm, used his binoculars to look straight across his property to watch the fire fight, but he could not see the shooter. He, too, thought appellant was not present during the shoot-out. During cross-examination he testified:

Q: How do you suppose Kenny knew about the officers on the 14th—that he knew the officers' guns had been used on them if he wasn't even there?

A: That's your guess is as good as mine.

Q: I mean, because you've said he's gone—

A: He said it.

Q. He's gone, right?

A. Yeah. When I got past the deputy's car he was not there.

Q. He was gone. I mean, his car was gone?

A. Was gone.

Q. And if people said he was in Poteet 35 or 40 minutes later you wouldn't have any reason to doubt that, would you? You can get to Poteet from here in 35 or 40 minutes, right?

A. Yeah.

. . .

Q. So he was gone when all the shooting happened as far as you know?

A. As far as I know.[4]

Mr. Essary's testimony explicitly placed appellant's car right in front of the trailer when Essary passed by at 7:45 p.m. Except for two mounds of dirt, the area around the trailer is barren and treeless; there is no place where appellant's Hyun-dai could be parked and not be visible from either of the two intersecting roads. Several witnesses saw the first two police cars turn into the trailer area or saw them as soon as they had stopped. No one saw appellant's car reflected in the headlights. No one saw appellant's car, which had been parked immediately in front of where the two patrol cars pulled in. No one saw appellant or any indication that appellant was present. No witness at trial stated or suggested that appellant was there.

Indeed, the State's expert crime-scene investigator, John Martin, meticulously walked the jury through his recreation of the shooting—a version in which Engleton was the sole shooter and only perpetrator present at the scene. Officer Martin checked the roof of the trailer that night because someone had said that "maybe" someone had been on the roof. He found no evidence that anyone had been on the roof that night. He testified that he found no crime-scene evidence that led him to think that appellant was involved in the shoot-out.

Furthermore, it is undisputed that appellant arrived in Poteet by 9:00 p.m. The drive is 21.7 miles from the trailer. Deputy Monse was killed at 8:28 p.m. Any theory that supposes appellant was present on the trailer roof shooting at something or someone between 8:30 and 8:33 when Mr. Hutton saw what he thought was a flashlight on the roof must also account for the fact that appellant's car, which had needed a jump start shortly after 8:00 p.m.,[5] was invisible to several

---

**4.** On October 24th, the local newspaper reported that Engleton shot two of the deputies with one of their own guns. Two days later, on October 26th, Mr. Essary went to the police station and told the officers that, when he gave his written statement to the police immediately after talking with appellant on October 14th, he had forgotten to include the fact that appellant had told him that Engleton "had gone too far when he shot the deputies with their own gun."

**5.** Sara Lopez testified that, when appellant arrived at his brother's house at 9:00 p.m., she asked him why he had taken so long. Appellant told her that his car wouldn't start. He said that he had jumper cables and that he had had to move Engleton's car up next to his

passersby at or immediately before and after that time, and that appellant had to have scrambled down from the roof after shooting, found Engleton, wiped any fingerprints from the guns, given Engleton those guns which were later found next to Engleton's body, found his hidden car, gotten into it, started it up, passed by five watching neighbors without being seen by any of them,[6] and driven to Anthony's house in Poteet, all in less than thirty minutes. This is an extraordinary feat in itself. Moreover, there is no evidence to support its occurrence.

---

and jump start his car. Jesus Garza testified that he saw appellant drive Engleton's car around to the front of the trailer at this time, which is consistent with what appellant told Sara 45 minutes later.

6. Jesus Garza was watching; George Gorman was watching; Robert Hutton was watching; Alexander Sanchez was watching; Ed Essary was watching. None of them saw appellant or appellant's car after 8:15 p.m.