Opinion to: SJR TGT SN TJ EVK ERA GCH LCH JB









Opinion Issued June 15,
2006

 

 

 

 




 













 

     

 

 

 

 

 

In The

Court of Appeals

For The

First District of Texas

 




 
 
 
 
 
 
 
 
 
 
 
 
 
 
 


 



NO. 01-05-00452-CR

 




 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 


 

 



GREGORY O’NEIL LOVE, Appellant

 

V.

 

THE STATE OF TEXAS, Appellee

 

 



On Appeal from the 180th District Court

Harris County, Texas

Trial Court Cause No. 948720

 








 

 



O P I N I O N

Appellant Gregory O’Neil Love pleaded
not guilty to the felony offense of capital murder.  A jury found Love guilty.  As the State did not seek the death penalty,
the trial court sentenced Love to life imprisonment.  In three issues, Love contends (1) the
evidence is legally and factually insufficient to demonstrate that he intended
to aid in the offense of capital murder, (2) the trial court erred in failing to
charge the jury on the defense of renunciation, and (3) the trial court erred
in admitting improper victim impact evidence during the guilt-innocence phase
of trial.  We conclude that legally and
factually sufficient evidence supports the conviction and that the trial court
did not abuse its discretion in charging the jury or admitting the evidence in
question.  We therefore affirm.

Facts

          In
May 2003, Love worked as a night manager of a Whataburger in northwest
Houston.  One night, Gerald Marshall, with
whom Love previously had worked at a Popeye’s restaurant, visited the
Whataburger.  Derrel McQueen, who occupied
the car with Marshall, testified that Love stood outside the Whataburger,
hosing down the parking lot.  Marshall
recognized Love, and exited the car to speak with him.  Tony Ketchum, a Whataburger employee on duty that
night, testified that Love recognized one of the men in a car that pulled up to
the drive-through window, and went outside to speak to him.  

McQueen testified that he overheard
Love tell Marshall that he should return to the restaurant to commit a robbery
on a night while Love worked, at around three or four o’clock in the
morning.  Love told Marshall to enter the
store by climbing through the drive-through window, and Love would pretend as
though they did not know each other and would give Marshall money.  McQueen further testified that Love told
Marshall that, if someone was working besides Love, not to let that person tell
him that he did not have keys or know how to open the safe, because that person
could open the safe.  Love gave Marshall
his telephone number and some free food, and Marshall and McQueen left.  Marshall’s girlfriend, Tamara Woods,
testified that she saw Marshall with a napkin bearing the name “Greg” and a
telephone number.  Marshall told her that
he knew a manager at a Whataburger who was going to help him rob the store.

          After
talking with Marshall, Love told several employees that the men he had been
talking to outside had guns and were attempting to rob someone at the
restaurant, but that he knew one of the men and was able to convince them not
to rob anyone.  Several Whataburger
employees testified that Love had mentioned this foiled robbery to them, and
Ketchum testified that when he came to work the next day, everyone was talking
about it.  One employee testified that
Love told everyone to be careful in case the robbers attempted to rob someone
at the restaurant again.  Davilyn Spencer,
the general manager, testified that Love explained the incident to her as a
food complaint, not an attempted robbery. 
She testified that he told her merely that some men were dissatisfied
with their food and Love gave them free food to make them happy.  Love never notified police or management of
the attempted robbery.

On May 11, 2003, Love arrived early
to his graveyard shift.  Also on duty that
night were Wilbert Marsh, Ketchum, Agnes, and Chris Dean.  Dean was a mentally retarded employee who had
worked for Whataburger for fourteen years. 
Dean was very dedicated to Whataburger, knew everything about the
restaurant, and had worked at every position except team leader or
manager.  Though Love was scheduled to
work from 11:00 p.m. to 7:00 a.m., he arrived early, around 9:00 p.m.  Arthur Miller, the manager scheduled to work
from 3:00 p.m. to 11:00 p.m., was on duty when Love arrived.  Miller asked Love if he could leave early
since Love had arrived, and Love agreed. 
Before Miller left, he counted the money in the safe, but he and Love
agreed that Love would count the money that had accumulated in the registers
during the 3:00 p.m. to 11:00 p.m. shift. 
Miller testified that company policy provided for money to be counted
and placed in the store safe at the end of every shift, but that occasionally
managers would agree to count the money from someone else’s shift.  The general and area managers of the
Whataburger testified that it was important for the manager on duty to “count
down” the cash registers at the end of a shift to ensure that a minimum amount
of cash would be available on the floor in the event of a robbery.  

Telephone records established that
Love called Marshall from his cell phone around 9:45 p.m., and around 10:00 p.m.
Marshall called Love.  Miller testified
that about ten or fifteen minutes after he left the Whataburger, his wife telephoned
him, reporting that Love had called Miller’s house to say that Love needed to
leave work because his brother had been shot. 
Miller and Love then had a telephone conversation in which Love told
Miller he needed to leave work and asked if he could leave Dean in charge of
the restaurant.  Miller told Love that
Dean had run the restaurant before, but that he had not done so since the new
general manager, Spencer, had taken over, because Dean was not a team
leader.  Miller and Spencer both
testified that a manager or team leader was supposed to be in charge of the
restaurant at all times, and that Dean should not have been left in charge
because he was not a team leader.  Dean
wanted to be a team leader but was unable to pass the written test.  Miller and Spencer also testified that the
proper procedure in such a situation would be to notify the general manager or
area manager if a family emergency arose and obtain approval to leave.  Miller further testified that if Love had asked
him to return to the restaurant to work that evening, he would have done
so.  

Love did not ask Miller to return,
but instead left Dean in charge of the restaurant without permission from the
general or area managers.  Marsh, a cook
working at the Whataburger that night, testified that Love asked Agnes to stay
late so he could leave.  Love left the
store around 11:30 p.m., leaving Dean, Marsh, Agnes, and Ketchum alone at the
restaurant.  Marsh and Ketchum both
testified that Agnes stayed at the Whataburger until about 2:00 a.m. to cover
for Love, though her shift had been scheduled to end at 11:00 p.m.  Love did not count the money in the cash
registers or deposit any money in the safe or lockboxes before he left, thus
leaving the maximum amount of cash in the registers.  Love also left $125 in petty cash outside the
safe in case Dean needed to make change for large bills.  Spencer testified that there would have been
about $1,600 in the registers that night before Love left.

After Love left, Dean discovered that
Love had not counted the money in the registers.  Although it was not his responsibility, Dean
took it upon himself to count the money in the registers and deposit the excess
in the lockboxes.  In addition, Dean
called Love several times to inquire when he would be returning to the
restaurant, and several witnesses testified that Love said he would be
returning to work.  Love never returned
to the restaurant that night.  

At around 4:00 a.m., three men came
through the drive-through and placed an order. 
When the men arrived at the drive-through window, Dean leaned out the
window to tell them he did not understand their order.  At that point, one of the men grabbed Dean by
his shirt collar, pointed a gun at Dean’s head, and told him it was a stickup.  The man, later identified as Marshall, entered
the restaurant by climbing through the window. 
Marsh, who was standing nearest to Dean making a hamburger, ran and hid
in the storage area near the back door of the restaurant. Ketchum hid in the
freezer.  Marshall then chased Dean to
the back of the restaurant where he demanded that Dean give him the key to the
safe.  Marsh testified that Marshall told
Dean three times that if he did not give him the key to the safe he would shoot
him.  Dean did not have the key to the
safe because the safe could only be opened by combination, but he did have a
key to the lockboxes.  After Dean failed
to produce the key, Marshall shot him in the face and fled the scene.  Marsh testified that he waited about fifteen
minutes and then called the police. 

The next morning, Spencer, Miller,
and other employees of the Whataburger arrived at the restaurant and waited
outside while the police finished investigating the scene.  Love was the only Whataburger employee who
did not appear.  When Spencer re-entered
the restaurant, she counted the money in the safe, and discovered that only the
$125 in petty cash that Love had left for Dean to use in making change was
missing.  Love arrived for work that
evening, and collected his payroll check the following day.  While he was there, Spencer asked him about
the missing petty cash.  Spencer and
Miller both testified that Love went into the office and showed them that the
petty cash was on a shelf above the computer. 
Both testified that the money was not on the shelf when they searched
the office upon re-entering the restaurant after Dean’s murder.

A Crimestoppers tip later identified
Marshall and Ronald Worthy as the men who robbed the Whataburger.  Kenny Calliham, who drove the getaway car the
night of the robbery, turned himself in. 
Calliham testified that he was unaware of the plan to rob the
Whataburger until they arrived at the restaurant and Marshall pulled a
gun.  Calliham testified that no one
mentioned Love’s name to him.  When investigators
approached Love, he admitted that his brother had not been shot the evening
before the murder, but stated that he left work that night because he was
having marital problems.  Love’s
stepbrother testified that he had invited Love to go to a club that night, and
that was the reason Love left work early.

Legal and Factual Sufficiency

In his first issue, Love contends the
evidence is legally and factually insufficient to demonstrate that he intended
to aid in the offense of capital murder. 
Love concedes on appeal that the evidence is sufficient to support a
conviction as a party to aggravated robbery; thus, his sole challenge is to the
sufficiency of the evidence that he intended, or should have anticipated, that
a murder would be committed as part of the aggravated robbery.

When evaluating the legal sufficiency
of the evidence, we view the evidence in the light most favorable to the
verdict and determine whether any rational trier of fact could have found the
essential elements of the offense beyond a reasonable doubt. Jackson v.
Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Drichas v.
State, 175 S.W.3d 795, 798 (Tex. Crim. App. 2005).  When evaluating factual sufficiency, we
consider all the evidence in a neutral light to determine whether the jury was
rationally justified in finding guilt beyond a reasonable doubt.  Zuniga v. State, 144 S.W.3d 477, 484
(Tex. Crim. App. 2004).  Evidence may be
insufficient if, considered alone, it is too weak to support the verdict, or
if, weighing all the evidence, the contrary evidence is strong enough that the
beyond-a-reasonable-doubt standard could not have been met.  Id. at 484–85.  In conducting such a review, we consider all
of the evidence weighed by the jury, comparing the evidence that tends to prove
the existence of the elemental fact in dispute to the evidence that tends to
disprove it.  Vodochodsky v. State,
158 S.W.3d 502, 510 (Tex. Crim. App. 2005). 
We are authorized to disagree with the jury’s determination even if
probative evidence exists to support the verdict, but we must avoid
substituting our judgment for that of the fact-finder.  Id. 
In conducting such a review, we consider the most important evidence
that the appellant claims undermines the jury’s verdict.  Sims v. State, 99
S.W.3d 600, 603 (Tex. Crim. App. 2003).  Under
either review, the fact-finder is the exclusive judge of the witnesses’
credibility and the weight to be given to their testimony.  Jones v. State, 944 S.W.2d 642, 647–48
(Tex. Crim. App. 1996).  

A person commits capital murder if he
intentionally causes the death of an individual in the course of committing or
attempting to commit robbery.  Tex. Pen. Code Ann. §§ 19.02(b)(1),
19.03(a)(2) (Vernon 2003 & Supp. 2005). 
It is undisputed that Love was not present during the commission of the
offense, so he is guilty, if at all, as a party to the offense.  Under the law of parties, the jury could have
found Love guilty by concluding that either: (1) under Penal Code section
7.02(a), acting with intent to promote or assist the commission of the murder,
Love solicited, encouraged, directed, aided, or attempted to aid another person
to commit the murder; or (2) under section 7.02(b), the murder was committed in
an attempt to carry out a conspiracy to commit robbery, and, though Love had no
intent to commit the murder, it was committed in furtherance of the unlawful
purpose and should have been anticipated as a result of the carrying out of the
conspiracy.  See id. § 7.02(a),
(b) (Vernon 2003); see also Tippitt v. State, 41 S.W.3d 316, 323
(Tex. App.—Fort Worth 2001, no pet.).  “In
determining whether the accused participated as a party, the court may look to
events occurring before, during and after the commission of the offense, and
may rely on actions of the defendant which show an understanding and common
design to do the prohibited act.”  Ransom
v. State, 920 S.W.2d 288, 302 (Tex. Crim. App. 1994).  A defendant in a capital murder case may be
convicted solely on a conspiracy theory of culpability contained in the jury
charge.  Fuller v. State, 827
S.W.2d 919, 932–33 (Tex. Crim. App. 1992). 


Here, the evidence is sufficient to
support Love’s conviction under section 7.02(b) of the Penal Code because the
evidence supports a finding that Love should have anticipated the possibility
of a murder resulting from the course of committing this robbery.  Love concedes the evidence is sufficient to
establish that he was part of a conspiracy to commit robbery at the Whataburger,
so the conspiracy to commit a felony requirement of section 7.02(b) is
satisfied.  In addition, Love does not
challenge that the murder was committed in furtherance of the robbery; thus, we
need only consider whether the evidence is sufficient to demonstrate that Love
should have anticipated a murder occurring in the course of the robbery.  According to McQueen, Love told Marshall that,
if Love was not present when he arrived at the Whataburger to carry out the
robbery, Marshall should not “believe” anyone who told him that the employee in
charge did not have keys to the safe, because that person would have keys.  Police recovered keys to the lockbox on
Dean’s body after the robbery, and the area manager testified that Dean might not
have made the connection that the keys to the lockbox, which he possessed,
could have satisfied the robber’s request for keys to the safe.  The evidence further shows that Love knew
that these robbers likely would carry guns from his statement to his fellow
employees earlier that month that they should be careful if these men returned
to rob someone at Whataburger because they carried guns.  A jury could infer from Love’s statement that
he anticipated, or should have anticipated, the possibility that Marshall might
resort to firing a gun if the person in charge claimed not to be able to open
the safe.  

Love contends under Tippitt v.
State that unless a defendant knows his co-conspirators have guns, the
evidence may be insufficient to demonstrate that he should have anticipated
murder as a result of carrying out the underlying felony.  41 S.W.3d at 323.  Here, however, the evidence demonstrates that
Love had some knowledge that his co-conspirators would use guns in the course
of the robbery.  Several Whataburger
employees testified that, when Love explained the purported thwarted robbery
attempt, he stated that the would-be robbers had guns.  Ketchum testified that he was working the
night of the foiled robbery, and when Love told the story immediately after it
happened, he told Ketchum the men had “guns.” 
Another Whataburger employee testified that Love told employees to be
careful after the thwarted robbery attempt, because the would-be robbers had
guns and might try to rob someone at the restaurant again.  Evidence that a defendant knew his
co-conspirators might use guns in the course of the robbery can be sufficient
to demonstrate that the defendant should have anticipated the possibility of
murder occurring during the course of the robbery.[1]  We therefore hold that the jury reasonably
could have concluded that Love should have reasonably anticipated the
possibility of a murder occurring in the course of the robbery.

In addition, several employees and
Dean’s mother testified that Dean could get flustered in out-of-the-ordinary situations.  It was common knowledge among Whataburger
employees that Dean had a mental impairment, that he loved his job, and that he
was very protective of the Whataburger where he worked.  Love’s knowledge of Dean’s impairment and
feelings toward Whataburger suggests that, in telling Marshall not to “believe”
an employee who claimed not to have keys, Love anticipated that Dean might try
to protect the restaurant by refusing access to the money.  Based on Love’s statements to Marshall, his
knowledge that the robbers might use guns, and his knowledge of Dean’s mental
impairment and loyalty toward Whataburger, we hold the evidence is legally
sufficient to support Love’s conviction under section 7.02(b).  Tex.
Pen. Code Ann. § 7.02(b).

We further conclude that, viewing the
evidence in a neutral light, the evidence of guilt is not so weak, nor the
contrary evidence so strong, that the beyond-a-reasonable doubt standard could
not have been met.  In support of his
factual insufficiency argument, Love points to evidence that he attempted to
make the robbery go as smoothly as possible by leaving the maximum amount of
money out of the safe, thus indicating that he did not anticipate that a murder
would occur.  He also contends the
evidence that he left the restaurant on the night of the robbery, though he had
agreed with Marshall that he would be present during the robbery, indicates an
attempt to back out of the robbery.  However,
the mere existence of a reasonable alternative hypothesis does not render the
evidence factually insufficient.  Richardson
v. State, 973 S.W.2d 384, 387 (Tex. App.—Dallas 1998, no pet.).  Evidence that Love had a phone conversation
with Marshall shortly before he left the restaurant, and that he did not lock
up the money, or warn the employees of the robbery, indicates a desire that his
co-conspirators carry out the robbery. 
Further, Love’s knowledge that Marshall might use a gun in committing
the offense, combined with his statement to Marshall not to let the person in charge
of the restaurant say he did not have a key to the safe, and his knowledge of
Dean’s protective feelings toward Whataburger, indicate that he should have
anticipated the possibility of a murder.

We note that the Court of Criminal
Appeals recently overturned a capital murder conviction for factual
insufficiency in Vodochodsky v. State, and conclude that this case is
distinguishable.  158 S.W.3d 502, 511
(Tex. Crim. App. 2005).  There, the defendant
was convicted of capital murder and sentenced to death for helping his roommate
carry out a plan to commit suicide by engaging police in a deadly
shootout.  Id. at 504.  The court concluded the evidence was
factually insufficient despite evidence that Vodochodsky knew about his
roommate’s plan and bailed him out of jail so he could carry out the plan,
because none of the evidence directly indicated that Vodochodsky intended to
help his roommate kill police officers, and contrary evidence indicated
Vodochodsky did not wish to participate in the plan.  Id. at 510–11.  The trial court charged the jury in
Vodochodsky’s case under section 7.02(a), such that it could find Vodochodsky
guilty only if he had the specific intent to promote or assist his roommate in
carrying out a capital murder.  Id.
at 509.  The Court of Criminal Appeals concluded
that the evidence was factually insufficient to demonstrate that Vodochodsky  intended to assist his roommate in murdering
police officers.  Id. at 510.  Here, the court charged the jury under
section 7.02(b), which does not require a specific intent to commit murder, but
only that the defendant should have anticipated murder occurring in the course
of carrying out a robbery.  See Valle
v. State, 109 S.W.3d 500, 503–04 (Tex. Crim. App. 2003) (“A
defendant may be convicted of capital murder
under § 7.02(b) without
having the intent or actual anticipation that a human
life would be taken that is required for an affirmative answer to the anti-parties issue.”).  

Thus, we conclude the evidence is
legally and factually sufficient to support Love’s conviction under section
7.02(b).  Because the jury returned a
general verdict, and because the evidence is both legally and factually
sufficient to support a finding of guilt under section 7.02(b), we uphold the
jury’s verdict.  Rabbani v. State,
847 S.W.2d 555, 558 (Tex. Crim. App. 1992); Cienfuegos v. State, 113 S.W.3d 481, 490 (Tex. App.—Houston [1st Dist.] 2003, pet.
ref’d).  

Charge Error

In his second issue, Love contends
the trial court erred in failing to charge the jury on the defense of
renunciation under Penal Code section 15.04(b). 
Tex. Pen. Code Ann. § 15.04(b) (Vernon 2003).  Specifically, Love contends that he raised
the defensive issue of renunciation with evidence that he warned the other
Whataburger employees to be careful because his friend might try to commit robbery
at the restaurant, and with evidence that he left the restaurant before the
robbery.  The State responds that the
renunciation defense under Penal Code section 15.04(b) only applies to an
offense of criminal conspiracy under section 15.02.  See id. §§ 15.02, 15.04(b).  We agree.

When reviewing jury charge error, we
first determine if error actually exists in the jury charge and, if we find
error, we determine whether it harmed the appellant.  See Ngo v. State, 175 S.W.3d 738, 743
(Tex. Crim. App. 2005).  We review the
trial court’s decision not to include a defensive issue in the jury charge for
an abuse of discretion.  See Wesbrook
v. State, 29 S.W.3d 103, 122 (Tex. Crim. App. 2000).  

The Penal Code requires the trial
court to include a jury instruction on any affirmative defense when the
evidence supports that defense.  See Tex. Pen. Code Ann. § 2.04 (Vernon
2003).  Once the trial court admits such
evidence, the jury charge must contain the instruction.  See Arnold v. State, 742 S.W.2d 10, 13
(Tex. Crim. App. 1987).  Penal Code section
15.04(b) establishes that

[i]t is an affirmative defense to prosecution under
Section 15.02 or 15.03 that under circumstances manifesting a voluntary and
complete renunciation of his criminal objective the actor countermanded his
solicitation or withdrew from the conspiracy before commission of the object
offense and took further affirmative action that prevented the commission of
the object offense.

 

Tex. Pen.
Code Ann. § 15.04(b).  Unless a defendant is charged under sections
15.02 or 15.03 of the Penal Code, the renunciation defense under section 15.04
does not apply.  See Wesbrook, 29
S.W.3d at 122.  Here, the State charged Love
as a party under Penal Code section 7.02(b), not with the separate offense of
conspiracy under section 15.02.  See Tex. Pen. Code Ann. §§ 7.02(b),
15.02.  Accordingly, we hold the trial
court did not err in denying Love’s request that the jury be charged on the
renunciation defense under section 15.04(b). 


Victim Impact Evidence

          In
his third issue, Love contends the trial court abused its discretion by
allowing impermissible victim impact testimony from Dean’s mother during the
guilt-innocence phase of the trial.  The
State responds first that Love failed to preserve this issue on appeal by
failing to specify on the record which questions and answers he wanted
excluded, and in the alternative that Dean’s mother’s testimony did not
constitute victim impact evidence.

          Before
Dean’s mother, Rose Barton, testified, Love objected that her testimony constituted
victim impact testimony, and therefore was impermissible at the guilt-innocence
phase of the trial.  In addition, Love
argued that other witnesses already had testified to Dean’s mental status, and
that Barton’s testimony on the same issue was more prejudicial than
probative.  The State responded that it
did not intend to elicit victim impact testimony, but rather intended to
establish Dean’s mental status and his loyalty to Whataburger, which the State
argued had “everything to do with [Love] leaving [Dean] at the restaurant
alone,” knowing that he was impaired and would likely be protective of the
restaurant.  The court sustained Love’s
objection with regard to victim impact testimony, but allowed Barton to testify
about Dean’s mental capacity and loyalty to his employer.  During Barton’s testimony, Love requested and
received a running objection.  In
addition, when the State asked Barton to describe Dean’s burial clothes, the
trial court sustained Love’s objection that the testimony went to victim
impact.  

          Texas
law requires a party to continue to object each time inadmissible evidence is
offered, except when defense counsel requests a running objection or objects out of the presence of the jury to all
testimony he deems objectionable on a given subject.  Martinez v. State, 98 S.W.3d 189, 193
(Tex. Crim. App. 2003); Ross v. State, 154 S.W.3d 804, 811 (Tex. App.—Houston
[14th Dist.] 2004, pet. ref’d).  Here,
Love requested both a hearing outside the presence of the jury and a running
objection.  We conclude that Love properly
preserved this issue on appeal.

          The
State next contends the trial court did not err in admitting Barton’s testimony
because it does not constitute victim impact evidence.  A trial court’s ruling concerning the admission
or exclusion of evidence may not be disturbed on appeal unless the trial court
abuses its discretion.  Najar v. State,
74 S.W.3d 82, 86 (Tex. App.—Waco 2002, no pet.).  We ask whether the trial judge’s decision lies
“within the zone of reasonable disagreement.”  Id.  In homicide cases, victim impact evidence is
traditionally defined as “evidence concerning the effect that the victim’s
death will have on others, particularly the victim’s family members.”  Mathis v. State, 67 S.W.3d 918, 928
(Tex. Crim. App. 2002).  Victim impact testimony is irrelevant at the guilt-innocence phase of a trial because
it does not tend to make more or less probable the existence of any fact of
consequence with respect to guilt
or innocence.  See Miller-El v. State,
782 S.W.2d 892, 895 (Tex. Crim. App. 1990); Garrett v. State, 815 S.W.2d
333, 337–38 (Tex. App.—Houston [1st Dist.] 1991, pet. ref’d).

          Here, Barton’s testimony did not relate to the effect Dean’s
death had on her, but instead related to his mental capacity and love for
Whataburger, facts that the trial court reasonably could have determined are
relevant to whether Love should have anticipated that a murder would result
from the robbery.  The trial court
sustained Love’s objection to any victim impact testimony.  Barton then testified that her son was slow
and had to be placed in special education classes from elementary school until
his graduation from high school.  She
testified that he followed directions well in school, but was not scholastically
equal to his peers, and he would sometimes become angry when he could not
participate in the same activities as his brother.  At that point, Love requested and received a
running objection to her testimony.  Barton
then testified about Dean’s work history, including how he came to work at
Whataburger, how long he worked there, what he did there, and how much he
enjoyed working there.  She testified
that Dean lived at home because she did not trust him living on his own, and
that it worried her that Dean worked at night because he would get scared and
“freeze up.”  Barton testified that Dean
worked at Whataburger for fourteen years, working his way up from maintenance
until he worked every position in the restaurant, and that he wanted very much
to be a team leader but was unable to pass the written test.  She testified that Dean loved Whataburger so
much that he worked extra shifts on his days off, and wore his uniform
everywhere, even to church.  Barton
testified that Dean loved Whataburger so much that his thirty-fourth birthday
cake was in the shape of a hamburger and french fries.  When the State asked Barton to describe
Dean’s burial clothes, Love objected to victim impact, and the trial court
sustained the objection.  We conclude
that the trial court did not abuse its discretion in allowing this testimony,
insofar as it relates to Love’s knowledge and state of mind before the robbery.  See Miller-El, 782 S.W.2d at 895; Petruccelli
v. State, 174 S.W.3d 761, 768 (Tex. App.—Waco 2005, pet. ref’d).

 

 

 

 

 

 

 

 

Conclusion

          We
hold that (1) the evidence is legally and factually sufficient to support
Love’s conviction because the jury reasonably could have concluded that Love
should have anticipated that a murder might occur in the course of committing
the robbery, (2) the trial court did not err in failing to charge the jury on
the defense of renunciation because that defense only applies to the offense of
conspiracy under Penal Code section 15.02, and (3) the trial court did not err
in allowing the testimony of Dean’s mother because it did not constitute victim
impact evidence.  We affirm the judgment
of the trial court.

 

 

                                                          Jane
Bland

                                                          Justice

 

Panel consists of Justices Keyes,
Alcala, and Bland.

Publish.  Tex.
R. App. P. 47.2(b)











[1] See Holiday v. State, 14 S.W.3d 784, 789–90 (Tex. App.—Houston [1st Dist.] 2000,
pet. ref’d) (holding that jury can reasonably infer intent to kill from use of
deadly weapon); see also Green v. State, 682 S.W.2d 271, 285–86 (Tex.
Crim. App. 1984) (holding murder should have been anticipated as possible
result of robbery where appellant admitted entering house armed with gun); Ruiz
v. State, 579 S.W.2d 206, 209 (Tex. Crim. App. [Panel Op.] 1979) (holding
direct evidence of appellant’s participation in aggravated robbery in concert
with other individuals while brandishing deadly weapon would permit jury to
infer that murder should have been anticipated as result); Williams v. State,
974 S.W.2d 324, 330 (Tex. App.—San Antonio 1998, pet. ref’d) (holding evidence
sufficient that murder committed in course of pawn shop robbery was foreseeable
to appellant where evidence showed at least one of five conspirators arrived at
scene armed with gun, there was testimony by accomplice witness that four of
five conspirators left apartment with weapons, and there was evidence that
bullets or casings from two different guns were recovered from scene); Coleman
v. State, 956 S.W.2d 98, 102 (Tex. App.—Tyler 1997, pet. ref’d) (holding
evidence sufficient to support finding that appellant should have anticipated
murder as result of conspiracy to commit carjacking where evidence showed that,
just prior to subject offense, confederate unsuccessfully tried to carjack
another vehicle in appellant’s presence by wielding .45 caliber pistol,
confederate announced he was going to get victim’s car, and after following
victim home, confederate armed himself with .45 caliber pistol, appellant armed
himself with sawed-off shotgun, appellant admitted having knowledge of weapons
in car, and appellant admitted supplying shotgun).