Opinion to: SJR TGT SN TJ EVK ERA GCH LCH JB









Opinion Issued August 3, 2006

 

 

 

 

 








 

     

 

 

 

 

 

In The

Court of Appeals

For The

First District of Texas

 




 
 
 
 
 
 
 
 
 
 
 
 
 
 
 


 



NOS. 01-05-00074-CR

          01-05-00075-CR

 




 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 


 

 



Robert Anthony Brown, Appellant

 

V.

 

THE STATE OF TEXAS, Appellee

 

 



On Appeal from the 228th District Court

Harris County, Texas

Trial Court Cause Nos. 990261 & 990262

 








 



O P I N I O N

          The
State charged appellant Robert Anthony Brown with aggravated robbery with a
deadly weapon and impersonating a public servant.  A jury found Brown guilty of both offenses,
and after finding two enhancement paragraphs true, sentenced him to forty-five
years’ imprisonment for each offense.  In
five issues, Brown contends the evidence is legally and factually insufficient
to sustain the jury’s verdict on aggravated robbery with a deadly weapon, the
trial court erred in denying his motion to suppress evidence obtained during a
search of his motel room, and the trial court erred in admitting evidence of
extraneous offenses during the punishment phase.  We affirm the impersonation judgment and
reverse and remand the aggravated robbery judgment for further proceedings.

Facts

One evening in June 2003, Jose Galvez
cashed his paycheck at a convenience store near his home, and chatted with some
friends who work at a local strip club.  On
his way home, Galvez observed a white pickup truck following him that he had
noticed at the convenience store.  The
truck displayed what he believed to be police lights.  He drove the short distance to his home,
where he pulled into his driveway.  The
truck pulled up behind him, blocking him in. 
Rene Sanchez (“Sanchez”) exited the truck, approached Galvez, showed him
a police badge, and told Galvez in broken Spanish that he had pulled him over
for looking for prostitutes and drugs. 

          Sanchez
ordered Galvez to spread his legs and place his hands on the seat of his
vehicle while he checked Galvez’s driver’s license in his computer.  Galvez testified that when he had been pulled
over previously, the officers had given him similar instructions.  While Sanchez supposedly checked Galvez’s identification
(“ID”), Brown stood by the passenger’s side door of the truck shining what Galvez
believed to be a police flashlight at Galvez’s tags and house.  Galvez testified that Brown held a flashlight
in one hand and something else in the other hand, and made signs as though he
had a weapon.  Galvez testified that
another man, the driver, waited inside the truck, but Galvez’s wife, Amanda,
testified that she saw only two men, Brown and Sanchez.  After waiting a moment for Sanchez to check
his ID, Galvez approached Sanchez’s truck, at which point Sanchez grabbed Galvez,
threw him against the side of the truck, and put a “gun” to his head.  Galvez testified that he did not know if
Sanchez’s gun was real, but that he was afraid. 

          Amanda
was in the house when the incident began, but went onto her porch when she saw
the lights outside.  She testified that
Brown was holding a very bright light in his left hand and a walkie-talkie in
his right hand.  After she realized that
the men standing outside were not her husband’s friends, Amanda returned to her
home, but emerged again a moment later, this time followed by her two small
children.  She stopped the children from
running to their father.  She testified that
when she came outside the second time, Brown had a bright light in his left
hand and a “gun” in his right hand, and that he told her to return to the house
or there would be trouble.  Amanda
testified that she saw Sanchez quietly say something to Galvez, and Galvez then
asked her to please go in the house.  Amanda
returned to her house again, and when she looked through her window, she saw
Brown talking on a walkie-talkie, which he held in his right hand, while still
shining the light at her house with his left hand.  During the incident, Sanchez took Galvez’s
wallet, keys, and cellular phone, after which the men re-entered their truck
and drove away.

          Nine
days later, Officer Mike Burdick pulled Brown over in a white 1988 Chevy pickup
truck after observing Brown turn right without signaling. After neither Brown
nor his passenger, Robert Jackowski, could provide him with ID, Officer Burdick
placed the men under arrest.  As Brown
exited the vehicle, Officer Burdick noticed several flashlights in the front
seat, a Q-Beam spotlight on the floorboard, and what appeared to be a gun under
the driver’s seat.  At that point,
Officer Burdick remembered hearing a general broadcast that several robberies
had occurred in the area involving men in a white truck impersonating police
officers.  Once the men were safely under
arrest, officers searched the truck and recovered two flashlights, a plastic
gun, a small black bat or night stick, a Q-Beam spotlight, a hand-held radio,
and a paper bag with several phrases, such as “I am the Immigration police” and
“put your hands up,” written on it in Spanish. 
Police also recovered pawn slips for assorted jewelry and a lawn mower, a
wallet not belonging to either passenger, and several rings of keys.

           When asked where he lived, Jackowski responded
that he was staying at a nearby motel, so Officer Burdick and another officer, Lieutenant
Casko, went to the motel to investigate. 
Upon arriving, Lieutenant Casko went to rooms 29 and 30, which he
believed were occupied by Brown and Jackowski, while Officer Burdick confirmed
with the motel manager that those rooms were occupied by individuals driving a
white truck. 

Beatrice Sanchez (“Beatrice”),
Brown’s wife and Sanchez’s sister, answered the door when Lieutenant Casko
knocked, and told Lieutenant Casko that she was staying in the room.  He asked if anyone else occupied the room,
she replied that no one did, and then verbally agreed to let Casko come in and
look around.  Casko entered the room
alone to check for other occupants.  He
did not have his gun drawn when talking to Beatrice, but did have it in hand
while looking around the corner into the bathroom for other occupants.  While checking for other occupants, Casko
noticed narcotics paraphernalia in plain view near the bed.  He returned to Beatrice outside the room,
where he was rejoined by Burdick, to request written consent to search the room.
 

          Officer
Burdick prepared, read, and explained a voluntary consent-to-search form for
Beatrice and asked whether she had questions and understood the form. After she
signed the consent form, officers searched the room and found a large black bag
filled with dirty laundry.  A black fanny
pack was discovered in the bag along with the laundry.  In the fanny pack were driver’s licenses,
resident alien cards, credit cards, social security cards, and two checkbooks. 

Legal and Factual Sufficiency

          In his first, second, and third
issues, Brown contends (1) the evidence is legally and factually insufficient
to sustain the jury’s finding that Brown committed a robbery with a deadly
weapon, (2) the evidence is legally and factually insufficient to support
Brown’s conviction for impersonating a police officer, and (3) the evidence is
legally and factually insufficient to support either of Brown’s convictions
under the law of parties.

A. 
Standard of Review 

When evaluating the legal sufficiency
of the evidence, we view the evidence in the light most favorable to the
verdict and determine whether any rational trier of fact could have found the
essential elements of the offense beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307, 319,
99 S. Ct. 2781, 2789 (1979); Drichas v. State, 175 S.W.3d 795, 798 (Tex.
Crim. App. 2005).  The standard is the
same for both direct and circumstantial evidence cases.  King v. State, 895 S.W.2d 701, 703
(Tex. Crim. App. 1995).  We do not
resolve any conflict of fact, weigh any evidence, or evaluate the credibility
of any witnesses, as this was the function of the trier of fact.  See Adelman v. State, 828 S.W.2d 418,
421 (Tex. Crim. App. 1992); Matson v. State, 819 S.W.2d 839, 843 (Tex. Crim.
App. 1991).  Instead, our duty is to
determine whether both the explicit and implicit findings of the trier of fact
are rational by viewing all the evidence admitted at trial in the light most
favorable to the verdict.  See Adelman,
828 S.W.2d at 422.  In so doing, any
inconsistencies in the evidence are resolved in favor of the verdict.  Matson, 819 S.W.2d at 843.

When evaluating factual sufficiency,
we consider all the evidence in a neutral light to determine whether the jury
was rationally justified in finding guilt beyond a reasonable doubt.  Zuniga v. State, 144 S.W.3d 477, 484
(Tex. Crim. App. 2004).  Evidence may be
insufficient if, considered alone, it is too weak to support the verdict, or
if, weighing all the evidence, the contrary evidence is strong enough that the
beyond-a-reasonable-doubt standard could not have been met.  Id. at 484–85.  In conducting such a review, we consider all
of the evidence weighed by the jury, comparing the evidence that tends to prove
the existence of the elemental fact in dispute to the evidence that tends to
disprove it.  Vodochodsky v. State,
158 S.W.3d 502, 510 (Tex. Crim. App. 2005). 
We are authorized to disagree with the jury’s determination even if
probative evidence exists to support the verdict, but we should not substitute
our judgment for that of the fact-finder. 
Id.  In conducting a
factual sufficiency review, we consider the most important evidence that the appellant
claims undermines the jury’s verdict.  Sims v. State, 99 S.W.3d 600, 603 (Tex. Crim. App. 2003).  

B. 
Aggravated Robbery

Brown contends the evidence is
legally and factually insufficient to prove beyond a reasonable doubt that either
he or Sanchez used a firearm in the commission of the robbery, and is thus
insufficient to support his conviction for aggravated robbery.

A person is guilty of aggravated
robbery if he uses or exhibits a deadly weapon in the course of committing a
robbery.  Tex. Pen. Code Ann. § 29.03 (a)(2) (Vernon 2003).  Proof of the use or exhibition of a deadly
weapon is an essential element of the offense of aggravated robbery.  Gomez v. State, 685 S.W.2d 333, 336 (Tex.
Crim. App. 1985).  A deadly
weapon is a firearm or anything manifestly designed,
made, or adapted for the purposes of inflicting serious bodily injury or
anything that, in the manner of its use or intended use, is capable of causing
death or serious bodily injury.  Tex. Pen. Code Ann.
§ 1.07(a)(17)(A), (B) (Vernon Supp. 2005). 


Here, Brown’s indictment alleges not
merely that he exhibited a deadly weapon, but that he exhibited a firearm.  When the State alleges unnecessary matters that
are descriptive of the essential elements of the crime, the State must prove
the descriptive matters as alleged.  Gomez,
685 S.W.2d at 336.  Thus, when
the State alleges in an indictment for aggravated robbery that the deadly
weapon used by the defendant was a firearm, as it did in this case, it is
required to prove use of a firearm beyond a reasonable doubt.  Edwards
v. State, 10 S.W.3d 699, 701 (Tex. App.—Houston
[14th Dist.] 1999), pet. dism’d, improvidently granted, 67 S.W.3d 228
(Tex. Crim. App. 2002) (per curiam).  A
“firearm” means any device designed, made, or adapted to expel a projectile
through a barrel by using the energy generated by an explosion or burning
substance or any device readily convertible to that use.  Tex.
Pen. Code Ann. § 46.01(3) (Vernon 2003).  

Brown’s indictment also charges him as a party
to the offense of aggravated robbery.  In
order to convict Brown as a party to aggravated robbery, the State had to prove
that he was criminally responsible for Sanchez’s use or exhibition of a firearm
during the offense.  See Stephens v.
State, 717 S.W.2d 338, 340 (Tex. Crim. App. 1986) (holding that, in order
to convict defendant as party to aggravated offense, State must prove that
defendant was criminally responsible for aggravating element); Wooden
v. State, 101 S.W.3d 542, 547–48 (Tex. App.—Fort Worth 2003,
pet ref’d) (same).  A person
is criminally responsible for the conduct of another if, “acting with intent to
promote or assist the commission of the offense, he solicits, encourages,
directs, aids, or attempts to aid the other person to commit the offense.”  Tex.
Pen. Code Ann. § 7.02(a)(2) (Vernon 2003); Wooden, 101 S.W.3d at
546.  In determining whether an accused
bears criminal responsibility for an offense, we may look
to events before, during, and after the commission of the offense.  Marable v. State, 85
S.W.3d 287, 293 (Tex. Crim. App. 2002).

Legal Sufficiency

Viewing the evidence in the light
most favorable to the verdict, and excluding evidence that police later
discovered a toy gun in Brown’s vehicle, a rational trier
of fact could have found beyond a reasonable doubt that Brown is criminally
responsible for Sanchez’s use of a firearm.  Galvez testified that after Brown and Sanchez
pulled him over in front of his house, he exited his truck, and Sanchez told
him to wait there while he verified Galvez’s information in his computer.  After waiting a few minutes, Galvez
approached Sanchez’s truck, and Sanchez pushed Galvez against the truck and put
a “gun” near his head.  Galvez testified
that Sanchez’s gun was the kind that “you cock in the back,” and that it was
“cold.”  Galvez testified that while this
occurred, Brown remained on the passenger’s side of Sanchez’s truck, shining a
light at Galvez’s house and license plate and pointing something toward
Galvez’s house.  Amanda and Galvez
testified that when Galvez’s children saw him in front of the house, they ran
outside to greet him and Amanda followed them. 
When this occurred, Brown told Amanda and the children in English to go
inside or something bad was going to happen, and made signs like he had a
“weapon.”  Galvez testified that it
looked as though Brown had a gun, but that he could not tell what was in
Brown’s hand.  Both Amanda and Galvez
testified that they were afraid.  We
conclude that, viewing this evidence in a light most favorable to the verdict,
a rational jury could have found beyond a reasonable doubt that Sanchez used a
firearm during the commission of the robbery, and that Brown, acting with
intent to assist the commission of the robbery, attempted to aid Sanchez in
using a firearm to threaten Galvez.  See
Marable, 85 S.W.3d at 293

Factual Sufficiency

Viewing all the evidence in a neutral
light, however, we conclude the evidence is factually insufficient to support
Brown’s conviction for aggravated robbery with a firearm.  Here, we view all of the evidence in the
record related to Brown’s sufficiency challenge, not just the evidence that
supports the verdict, without the prism of “light most favorable to the
prosecution.”  

First, we conclude the evidence is factually
insufficient to sustain Brown’s conviction as a primary actor.  Galvez testified that during the course of
the robbery he mainly paid attention to Sanchez.  He testified that it was nighttime, there was
no overhead lighting, and he saw Brown from far away.  Amanda testified that she stood twelve paces
from where the incident occurred on the street, and that she was too far away
and it was too dark to describe Brown’s facial features, determine if he had
scars or tattoos, determine the color of his eyes, or determine whether he had
facial hair.  Neither Galvez nor Amanda
was able to describe Brown’s “gun.”  Galvez testified that he was not sure Brown
had a gun, only that he was pointing something toward his house.  Amanda testified that she looked at Brown
three times.  The first time she saw
Brown holding a bright light in his left hand and a walkie-talkie in his right
hand.  Moments later, while attempting to
send her children inside the house, she saw Brown holding a bright light in his
left hand and a gun in his right hand. 
As soon as she re-entered the house, however, she looked out the window
at Brown and again saw him holding a bright light in his left hand and a
walkie-talkie in his right hand.  Officer
Burdick testified that when he pulled Brown over nine days after the incident,
he found two flashlights, a Q-Beam spotlight, a hand-held radio, a night stick,
and a plastic handgun.  In light of the
distance from which the witnesses viewed Brown, the nature of their testimony
regarding the gun, and the evidence that police officers recovered a toy gun
and a hand-held radio, we conclude the evidence contrary to the jury’s verdict
is so strong that the beyond-a-reasonable-doubt standard could not have been
met.  See Zuniga, 144 S.W.3d at
485.

The State contends under Wright v. State
that testimony by a witness that a defendant used a “gun” is enough to find
that a firearm was used.  591 S.W.2d 458,
459 (Tex. Crim. App. 1979).  In Wright,
the defendant was in close proximity to the complainant when he pulled a weapon
which the complainant referred to as a “gun,” a “revolver,” and a
“pistol.”  Id.  A “gun,” however, may be a much broader term than
“firearm” when taken out of context, and may include such non-lethal
instruments as BB guns, blowguns, popguns, and grease guns.  See O’Briant v. State,
556 S.W.2d 333, 335–36 (Tex. Crim. App. 1977); see also Benavides v. State,
763 S.W.2d 587, 588 (Tex. App.—Corpus Christi 1988, pet. ref’d).  But courts consider such testimony together
with the other evidence.  For example,
the high court has held that a BB gun is not a deadly weapon unless there is
testimony indicating that it could have caused serious bodily injury by the
manner in which it was used during the commission of the crime.  See Adame v. State, 69 S.W.3d 581, 582 (Tex.
Crim. App. 2002) (“With testimony that a BB gun is capable of causing serious
bodily injury, it is reasonable for a jury to make a
deadly weapon finding.”); Mosley v. State, 545 S.W.2d 144, 146 (Tex. Crim. App.
1977) (holding unloaded BB gun pointed away from complainant was not deadly
weapon).  Specifically, courts have held that testimony
regarding the use of a “gun” may be insufficient to support a finding of use
and exhibition of a deadly weapon when the case presents separate evidence
indicating the use of a toy gun.  See Pena Cortez v. State, 732 S.W.2d
713, 715 (Tex. App.—Corpus Christi 1987, no pet.) (holding that testimony
regarding use of “pistol” was insufficient where it was uncontroverted that
“pistol” was toy gun).

Here, Amanda was at least twelve paces away, had
a spotlight shining in her eyes, and was simultaneously directing her small
children back into the house when she viewed what she testified was a “gun” in
Brown’s right hand the second time she looked at him.  Both immediately before and after that sighting,
however, she testified that Brown held a walkie-talkie in his right hand.  Galvez testified that he was standing by the
driver’s side of his vehicle while Brown was on the opposite side of a
different vehicle.  Galvez testified that
he was primarily paying attention to Sanchez, and that he was not sure whether
Brown had a gun.  Galvez and Amanda
referred to the item Brown held as a “gun” and a “weapon,” but never as a
pistol, revolver, or any other item which is per se a firearm—nor did they
describe the “gun.”  Viewed in a neutral
light, testimony from a witness viewing the defendant from a distance that the
defendant had a “gun,” in light of evidence that police recovered a
walkie-talkie and a toy gun, is not factually sufficient to sustain a finding
of a firearm.

This case is distinguishable from
cases in which the evidence was found sufficient to support the finding of a
firearm.  See, e.g., Edwards
v. State, 10 S.W.3d 699, 701 (Tex. App.—Houston [14th Dist.] 1999, pet. dism’d)
(evidence sufficient to support conviction for aggravated robbery where gun
defendant used in commission of robbery was “firearm,” and not non-lethal BB
gun, there was evidence that defendant threatened victims with gun, and two
victims, one of whom stated that she was security guard once and was familiar
with guns, testified that gun used in robbery resembled Colt .45 handgun and
not BB gun); Carter v. State, 946 S.W.2d 507, 509 (Tex. App.—Houston
[14th Dist.] 1997, pet. ref’d) (victims’ testimony that
defendant used gun similar to .25 caliber gun shown them at trial, and
threatened to shoot victims if they did not do as he ordered, was sufficient to
authorize rational jury to find that “firearm” was used during offense); Benavides,
763 S.W.2d at 589 (evidence was sufficient to show that firearm was used during
robbery and was thus sufficient to support conviction for aggravated robbery
where victim, who viewed defendant from close proximity, testified that
defendant used “gun” that was “automatic” and “medium-sized”).  Here, neither Galvez nor Amanda described the
“gun.”  Nor did either of them ever refer
to the object as a pistol, revolver, or any other object that is, by
definition, a firearm.  Neither witness
claimed to have any special knowledge of, or experience with, firearms.  To the contrary, Galvez testified that he was
not sure whether Brown had a gun.  The
State did not show the witnesses an exemplar gun, and neither witness ever
compared the “gun” to any actual firearm. 
In addition, here, police discovered a toy gun in Brown’s vehicle along
with the other instruments—such as the Q-Beam spotlight and walkie-talkies—they
believed were used in the robbery.

More importantly, there is less evidence of a
firearm in this case than in other cases where courts have held the evidence to
be insufficient.  For example, in Lee
v. State, the Austin Court of Appeals found the evidence insufficient to
sustain an aggravated robbery conviction where the complainant was robbed by
three men brandishing some type of pistol. 
51 S.W.3d 365, 375 (Tex. App.—Austin 2001, no pet.).  The victim in Lee testified that she
was in close proximity to the defendant and believed the gun was real.  Id. at 372.  Several witnesses testified to seeing the
gun, and one witness held the gun during part of the robbery.  Id. at 373.  An expert testified that air pistols, such as
the one the defendant used in that case, could be deadly weapons if loaded and
aimed at the head or neck, but that they were not deadly if unloaded.  Id. 
There was no evidence the air pistol was loaded, or that the defendant
had threatened the complainant’s life.  Id.  Here, Galvez and Amanda testified that Brown
told Amanda to go in the house or there would be problems, but neither
testified that Brown or Sanchez ever threatened either of their lives.  None of the witnesses in this case were able
to describe the “gun.”  None of the
witnesses testified that they believed the gun was real, and, in fact, Galvez
testified that he was not sure Brown had a gun at all.  In addition, there was no accomplice
testimony that anyone used a gun capable of causing serious bodily injury in
the commission of the offense.  Thus, we
conclude, viewing the evidence in a neutral light, that the evidence is
factually insufficient to sustain Brown’s conviction as a primary actor in the
aggravated robbery.

We further conclude that the evidence is
factually insufficient to sustain Brown’s conviction as a party to an
aggravated robbery with use of a firearm. 
In order to convict Brown as a party to aggravated robbery, the State
had to prove that he was criminally responsible for Sanchez’s use or exhibition
of a firearm during the offense.  See
Stephens, 717 S.W.2d at 340; Wooden, 101 S.W.3d at 547–48.  Here, Galvez testified that Sanchez told him
to wait by his vehicle while he went to check the computer in his truck.  After waiting a few minutes, Galvez
approached the truck, and Sanchez pushed Galvez against the truck and put a
“gun” to his head.  Galvez described the
gun as one of “those ones you can pull in the back of it.”  He testified that he did not know whether it
was real or fake, but that it was “ugly” and “cold.”  Police never recovered an actual
firearm—rather, they recovered a plastic gun from Brown’s car, along with the
walkie-talkie and other instruments used during the course of the robbery. 


In cases finding the evidence sufficient to
sustain a conviction for aggravated robbery under the law of parties, there was
evidence of an actual firearm as opposed to evidence of a plastic or fake
gun.  See, e.g., Johnson v. State, 6 S.W.3d 709, 711 (Tex.
App.—Houston [1st Dist.] 1999, pet. ref’d) (holding sufficient evidence of
aggravated robbery under law of parties where defendant was arrested in car
with accomplice who had Tech 9 strapped to his chest);  Brewer v. State, 852 S.W.2d 643, 647 (Tex.
App.—Dallas 1993, pet. ref’d) (holding sufficient
evidence of aggravated robbery under law of parties because defendant dropped
off and picked up accomplice who shot victims during aggravated robbery).  Here, no firearms were recovered, either from
the car or the motel room, and the descriptions of the gun are insufficient to
demonstrate that any gun used in the commission of the robbery was a firearm as
defined by the Penal Code.  

The Court of Criminal Appeals’s
recent finding of factual insufficiency in Vodochodsky v. State further supports
our conclusion that the evidence in this case is factually insufficient.  158 S.W.3d 502, 511 (Tex. Crim. App.
2005).  There, Vodochodsky was convicted
of capital murder as a party and sentenced to death for helping his roommate,
Jeremiah Engleton, carry out a plan to commit suicide by engaging police in a
deadly shootout.  Id. at 504.  The court concluded the evidence was
factually insufficient despite evidence that Vodochodsky knew about his
roommate’s plan and bailed him out of jail so he could carry out the plan,
because none of the evidence directly indicated that Vodochodsky intended to
help his roommate kill police officers, and contrary evidence indicated
Vodochodsky did not wish to participate in the plan.  Id. at 510–11.  

Shortly before the incident, a
neighbor saw Vodochodsky loading his vehicle with “stuff” from his and his
roommate’s home, and soon thereafter the police received a 911 call from the
home.  Id. at 506.  Police officers arrived about twenty minutes
later and the shootout began.  Id.
 After the shootout, the field
surrounding the house contained over one hundred used shotgun and rifle
casings, and police discovered several locations from which bullets appeared to
have been fired.  Id. at 508.  Vodochodsky told a police officer the day
after the shootout that he did not know about Engleton’s plan, but told a
neighbor that he had bailed Engleton out of jail so he could “do this.”  Id. at 511.  Vodochodsky told his neighbor that Engleton
wanted to carry out his plan the night Engleton had been arrested, but that
Vodochodsky told him not to because they had not planned it out yet.  Id. at 507–08.  Vodochodsky further told his neighbor that
Engleton had planned to kill himself and take some “pigs” with him, and that
the day of the shooting he had bailed Engleton out and the two had purchased
$200 worth of the best ammunition.  Id.
at 508.  Vodochodsky told his neighbor
that he had left Engleton four guns and had loaded the rest of the guns, the
papers related to the house and Engleton’s boat, and anything he believed the
police would confiscate, and then he left the house.  Id. 
A reporter who spoke with Vodochodsky several months after the shootout
testified that Vodochodsky told her that Engleton said he wanted to kill some
police officers, but that he had not taken Engleton seriously.  Id. 
Vodochodsky told the reporter that he had bailed Engleton out of jail,
they had purchased ammunition to use at a firing range, and he had no prior
knowledge of Engleton’s plan.  Id.    

The Court of Criminal Appeals concluded
that this evidence was factually insufficient, holding that “the overwhelming
weight of the evidence mitigates against the conclusion that Vodochosky
solicited, encouraged, directed, aided, or attempted to aid Engleton in
committing the offense.”  Id. at
510.  The court stated that though there
was some evidence of a second shooter, it was never established.  Id. 
The court concluded that there was no proof that Vodochodsky removed
belongings from the house as part of a murderous plot, and that none of his
statements directly referred to a plan to kill police officers.  Id. 


Similarly, here, Galvez’s testimony
that Sanchez’s gun was “cold” and could be cocked in the back is some evidence
that he had an actual firearm, but in light of Galvez’s testimony that he was
not sure the gun was real, and the evidence of a plastic handgun, this fact was
not established beyond a reasonable doubt. 
Furthermore, Amanda’s testimony suggests that Brown was pointing a
walkie-talkie at the house rather than a gun, thus creating a further ambiguity
regarding who might have used the plastic gun during the commission of the
robbery.  Under the second prong of Zuniga,
we conclude that the State’s evidence was so inherently weak
regarding Sanchez’s possession of a firearm that, without making all inferences
in favor of the verdict, the evidence is insufficient to support a finding
beyond a reasonable doubt that Brown was criminally responsible for any use of
a firearm by Sanchez during the course of the robbery.  See Zuniga, 144 S.W.3d at 485.

Accordingly, we hold the evidence is factually
insufficient to sustain Brown’s conviction for aggravated robbery with a
firearm, and we remand the case for a new trial on the aggravated robbery
charge.  See Clewis v. State, 922 S.W.2d 126, 133–35
(Tex. Crim. App. 1996).

C. 
Impersonating a Police Officer

          Brown
also challenges the legal and factual sufficiency of the evidence to support
his conviction for impersonating a police officer.  Section 37.11(a)(1) of the Penal Code provides
that “[a] person commits an offense if he impersonates a public servant with
intent to induce another to submit to his pretended official authority or to
rely on his pretended official acts.”  Tex. Pen. Code Ann. § 37.11(a)(1)
(Vernon 2003).  

Here, Galvez testified that while cashing his paycheck
at a convenience store, he had a conversation with some of his friends who work
at a strip club.  On his way home, he
noticed that he was being followed by a white truck he had seen at the
convenience store displaying what appeared to be police lights.  When Galvez stopped in his driveway, Sanchez
approached his vehicle, showed him a police badge, and told him in broken
Spanish that he had been stopped for soliciting prostitution and drugs.  Sanchez asked for Galvez’s ID and told him he
was going to check the information in his computer.  Galvez testified that Sanchez also told him
to spread his legs and place his hands on the seat of the car, and that when he
had been stopped by real police officers in the past, they had asked him to do
the same thing.  While this was taking
place, Brown stood by the passenger’s side of the truck, flashing a light at
the tags on Galvez’s vehicle.  When
Galvez approached the truck, Sanchez pushed him against it, and Brown asked if
Galvez “was clean,” meaning did he have a weapon.  Amanda testified that Brown was shining a
light at her and at some point appeared to be talking on a walkie-talkie.  Both Galvez and Amanda identified Brown as
having participated in the incident.  Two
flashlights, a Q-Beam spotlight, a night stick, a walkie-talkie, and a plastic
gun were found in Brown’s truck when he was pulled over.  A search of Brown’s vehicle also revealed a
bunch of keys, cellular phones, and a brown paper sack with police phrases
written on it in Spanish.  Galvez
identified his assailant’s vehicle as a white 1988–96 Chevy truck.  Brown was pulled over in a 1988 white Chevy
truck.  Viewing this evidence in the light
most favorable to the verdict, we conclude that a rational jury could have
found beyond a reasonable doubt that Brown impersonated a police officer.  In addition, viewing the evidence in a
neutral light, we conclude that the jury was rationally justified in finding
Brown guilty of impersonating a police officer beyond a reasonable doubt.

Motion to Suppress

          In
his fourth issue, Brown contends the trial court erred in denying his motion to
suppress the evidence seized from the motel room because (1) the State failed
to establish that Beatrice had actual authority to consent to a search of the
motel room, and (2) the State failed to establish that her consent was
voluntary.  The State responds that Brown
lacks standing to challenge the search, that the police obtained valid and
voluntary consent, and that Brown was not harmed by admission of the evidence.[1]  

A. 
Facts 

Immediately after arresting Brown and
Jackowski, and after discovering evidence that they believed might link Brown
and Jackowski to a series of robberies involving impersonation of police
officers, Officer Burdick and Lieutenant Casko went to the motel where
Jackowski claimed he was staying.  Upon
arriving, Casko went to rooms 29 and 30, which he believed were occupied by
Brown and Jackowski, while Burdick confirmed with the motel manager that those
rooms were occupied by individuals driving a white truck.  Beatrice answered the door when Casko knocked
and told him that she was staying in the room. 
He asked if anyone else occupied the room, she replied that no one did,
and then verbally agreed to let Casko come in and look around.  Casko entered the room alone to check for
other occupants.  He did not have his gun
drawn when talking to Beatrice, but did have it in hand while looking around
the corner into the bathroom for other occupants.  While checking for other occupants, Casko
noticed narcotics paraphernalia in plain view near the bed.  He returned to Beatrice outside the room,
where he was rejoined by Burdick, to request written consent to search the
room.  

          Officer
Burdick prepared, read, and explained a voluntary consent-to-search form for
Beatrice and asked whether she had questions and understood the form. After she
signed the consent form, officers searched the room and found a large black bag
filled with dirty laundry.  A black fanny
pack was discovered in the bag along with the laundry.  In the fanny pack were driver’s licenses,
resident alien cards, credit cards, social security cards, and two checkbooks,
none of which belonged to Beatrice, Brown, or Jackowski. 

B. 
Standard of Review

          We
apply a bifurcated standard of review to motions to suppress, giving almost
total deference to a trial court’s determination of historical facts, while
reviewing de novo the court’s application of the law.  See Dyar v. State, 125 S.W.3d 460, 462
(Tex. Crim. App. 2003).  In a motion to
suppress hearing, the trial court is the sole trier of fact and judge of the
credibility of the witnesses and the weight to be given to their testimony.  State v. Ross, 32 S.W.3d 853, 855 (Tex.
Crim. App. 2000); Foster v. State, 101 S.W.3d 490, 495 (Tex. App.—Houston
[1st Dist.] 2002, no pet.).  Accordingly,
the trial court may believe or disbelieve all or any part of a witness’s
testimony, even if that testimony is not controverted.  Ross, 32 S.W.3d at 855.   If,
as here, the trial court files no findings of fact, we view the evidence in a
light most favorable to the ruling and will uphold a trial court’s ruling on
any theory of law supported by the evidence.  Estrada v. State, 154 S.W.3d 604, 607 (Tex.
Crim. App. 2005).

C. 
Standing

          We
must first determine whether Brown has standing to contest the search.  An accused has standing to contest a search
under the Fourth Amendment only if he has a legitimate expectation of privacy
in the place searched.  Rakas v.
Illinois, 439 U.S. 128, 144, 99 S. Ct. 421, 430 (1978);
Granados v. State, 85 S.W.3d 217, 222–23 (Tex. Crim. App. 2002).  The defendant bears the burden of
establishing that he had a subjective expectation of privacy in the place
searched that society recognizes as reasonable. 
Granados, 85 S.W.3d at 223. 
Several factors are relevant to this latter determination of whether a
given claim of privacy is objectively reasonable: (1) whether the accused had a
property or possessory interest in the place invaded; (2) whether he was legitimately
in the place invaded; (3) whether he had complete dominion or control and the
right to exclude others; (4) whether, prior to the intrusion, he took normal
precautions customarily taken by those seeking privacy; (5) whether he put the
place to some private use; and (6) whether his claim of privacy is consistent
with historical notions of privacy.  Id.  This list of factors is non-exhaustive, and
no one factor alone is dispositive of a legitimate expectation of privacy.  Id.

          The
State argues that because Brown claimed he was not staying in either motel
room, he did not have complete dominion and control, and thus lacks standing to
challenge the search.  The Supreme Court
has recognized that a registered guest at a hotel has a reasonable expectation
of privacy in the room that he or she has rented and, consequently, is entitled
to constitutional protection against unreasonable searches and seizures there.  See Stoner v. California, 376 U.S. 483,
490, 84 S. Ct. 889, 893 (1964).  The
Supreme Court has also held that an overnight guest in someone’s home has a
legitimate expectation of privacy.  Minnesota
v. Olson, 495 U.S. 91, 98, 110 S. Ct. 1684, 1689 (1990).  This court concluded in Wilson v. State,
based on the preceding Supreme Court precedent, 
that an overnight guest of a registered hotel guest
shares the registered guest’s reasonable expectation of privacy in the room.  98 S.W.3d 265, 268–70 (Tex. App.—Houston [1st
Dist.] 2002, pet. ref’d).  

Here, Officer Burdick testified that
he spoke with the hotel manager before police searched the room, and that the
manager confirmed that Brown and Jackowski had rented rooms 29 and 30 and had
been staying there about a week.  Brown
testified that he had rented the rooms so Jackowski and Sanchez could stay
there, and so he could have sexual relations with his wife Beatrice.  Beatrice testified that she had been staying
in one of the rooms with Jackowski and Sanchez, and Brown would meet her
there.  Because Brown was the registered
hotel guest and had stayed overnight in the room to spend time with his wife,
he had a legitimate expectation of privacy in the room.  See id. at 278.  Accordingly, we conclude Brown has standing
to contest the search.

D. 
Authority to Give Consent

Brown contends the fruits of the
warrantless search of his motel room should have been suppressed because
Beatrice lacked actual authority to consent to the search.  A warrantless search by law enforcement
officers does not violate the Fourth Amendment’s guarantee against unreasonable
searches and seizures if the officers have obtained the consent of a third
party who possesses common authority over the premises or effects sought to be
inspected.  United States v. Matlock,
415 U.S. 164, 171, 94 S. Ct. 988, 993 (1974). 
“Common authority” rests on “mutual use of the property by persons
generally having joint access or control for most purposes.”  Id. at 171 n.7, 94 S. Ct. at 993 n.7.  If consent was not obtained from someone with
actual authority to consent to a search, a search may nevertheless be proper if
the person giving consent had apparent authority.  Illinois v. Rodriguez, 497 U.S. 177,
188–89, 110 S. Ct. 2793, 2801 (1990).  A third party’s consent is valid if the facts
available to the officer at the time of the search would warrant a person of
reasonable caution in believing that the consenting party had authority over
the premises.  See id. at 188, 110
S. Ct. at 2801.  If an officer reasonably
believed that the third party had common authority over the place to be
searched, then his good-faith mistake will not invalidate the search.  Id. 
This deference does not mean, however,
that the officer may rely on consent given in ambiguous circumstances or when
it appears clearly unreasonable to believe the third party is clothed with
authority to give consent.  Riordan
v. State, 905 S.W.2d 765, 771 (Tex. App.—Austin 1995, no pet.).

          Here,
Lieutenant Casko testified that when he knocked on the door to room 30,
Beatrice answered the door.  Casko asked
her if she was staying in the room, and she told him that she was.  He asked her if there was anyone else in the
room with her, and she replied that there was not.  He then asked for verbal consent to search
the room for other people, which she granted. 
While checking for other individuals in the room, Casko noticed drug
paraphernalia on the table in plain view. 
When Officer Burdick arrived, he asked Beatrice for her written consent
to search the room.  Burdick testified
that he knew several people were staying in the room, one of whom was Brown’s
wife, Beatrice.  Based on this evidence,
Beatrice had at least apparent authority to consent to a search of the
premises.

          The
Supreme Court recently held, in Georgia v. Randolph, “that a physically
present inhabitant’s express refusal of consent to a police search is
dispositive as to him, regardless of the consent of a fellow occupant.”  126 S. Ct. 1515, 1528 (2006).  There, Randolph’s wife called the police over
a domestic dispute.  Id. at
1519.  When police arrived, Randolph’s
wife told them that Randolph used drugs and had drugs inside the house.  Id. 
Police asked Randolph for consent to search the house, and he expressly
refused.  Id.  Police then asked Randolph’s wife for consent
to search, which she granted.  Id.  The Supreme Court held that Randolph’s
refusal to consent trumped his wife’s consent. 
Id. at 1526.  The present
case is distinguishable, however, because Brown was not present when police
asked Beatrice for consent, and he did not expressly refuse consent prior to
Beatrice giving consent.  We conclude
Beatrice had apparent authority to consent to the officers’ search of the motel
room.

E. 
Voluntariness of Consent

          Brown
next argues that even if Beatrice had authority to consent to the search, her
consent was involuntary.  When relying
upon consent to justify the lawfulness of a search, the State has the burden to
prove by clear and convincing evidence that the consent was freely and
voluntarily given.  Bumper v. North
Carolina, 391 U.S. 543, 548, 88 S. Ct. 1788, 1791 (1968); see also Corea
v. State, 52 S.W.3d 311, 316 (Tex. App.—Houston [1st Dist.] 2001, pet. ref’d).
 The burden requires the State to show
that the consent was positive and unequivocal, and there was no duress or
coercion.  Meeks v. State, 692
S.W.2d 504, 509 (Tex. Crim. App. 1985); Riordan, 905 S.W.2d at 770.  The burden cannot be discharged by showing no
more than acquiescence to a claim of lawful authority.  See Bumper, 391 U.S. at 548–49, 88 S. Ct.
at 1791­–92.  The validity of consent to search is
a question of fact to be determined from all the circumstances.  Rayford
v. State, 125 S.W.3d 521, 528 (Tex. Crim. App.
2003).

          Here, Lieutenant Casko testified that he was alone when
Beatrice answered the motel room door, and that she gave verbal consent to search
for other individuals who might be in the room. 
Casko testified that he may have had his weapon drawn when he looked in
the bathroom, but that he never pointed it at Beatrice, and that the other
officers never had their weapons drawn.  After
he noticed some drug paraphernalia in plain view, Casko took Beatrice outside
where Officer Burdick asked her to sign a consent to search the room.  Burdick testified that he and Casko were the
only officers near Beatrice when she signed the consent.  He testified that she did not appear to be
intoxicated, that she could and did read the consent, that she could and did
speak English, and that he read and explained the consent form to her before
she signed it, including a statement that she did not have to give consent.  Both officers testified that she was not
under arrest at the time she signed the consent, and that she was at all times
cooperative with their investigation.  We
hold that Beatrice’s consent was voluntary, and thus the search of the motel
room was valid.  Accordingly, we overrule Brown’s fourth issue.
 

Extraneous
Offenses

          Brown contends the trial court erred in admitting testimony
regarding an extraneous offense allegedly committed by Brown because the State
failed to prove Brown had committed the offense beyond a reasonable doubt.  The State contends Brown failed to preserve
error on the issue for appeal.  To preserve an issue for
appeal, a party must timely object, stating the specific
legal basis.  Tex. R. App. P. 33.1(a)(1); Rhoades v. State, 934
S.W.2d 113, 121, 127 (Tex. Crim. App. 1996).  “To be timely, an objection must be raised at
the earliest opportunity or as soon as the ground of objection becomes
apparent.”  Penry v. State, 903
S.W.2d 715, 763 (Tex. Crim. App. 1995).  In the absence of a timely motion or
objection, nothing is presented for appellate review.  Cooper v. State, 500 S.W.2d 837, 841
(Tex. Crim. App. 1973).  Here, in a
hearing outside the presence of the jury, defense counsel objected to allowing
the witnesses to identify Brown in court, which the trial court sustained.  Counsel then objected to allowing any
testimony by one of the witnesses, without giving a basis for the objection,
and without obtaining a ruling.  Twice
after the witnesses had finished testifying, counsel objected that the testimony
was not relevant, and that its probative value was outweighed by its
prejudicial effect.  Counsel never
objected that evidence of the offenses should be excluded for failure to
demonstrate Brown’s involvement beyond a reasonable doubt.  Thus, this argument has not been preserved
for appeal.

Conclusion

          We
hold (1) the trial court did not err in denying Brown’s motion to suppress
because police obtained voluntary consent to search the motel room from someone
with apparent authority, (2) the evidence is legally and factually sufficient
to support Brown’s conviction for impersonating a police officer, and (3) Brown
failed to preserve error on his argument that the extraneous offenses should
not have been admitted because they were not proven beyond a reasonable
doubt.  Accordingly, we affirm the
judgment of the trial court in cause number 990262 (appellate cause number
01-05-00075-CR) as to Brown’s conviction for impersonating a police officer.  We further hold that the evidence is legally
sufficient, but factually insufficient, to support the conviction for
aggravated robbery with a deadly weapon.  Accordingly, we reverse the judgment of the
trial court in cause number 990261 (appellate cause number 01-05-00074-CR) as to
Brown’s conviction for aggravated robbery, and remand it for a new trial.

 

 

                                                          Jane
Bland

                                                          Justice

 

Panel consists of Justices Taft,
Higley, and Bland.

Publish. Tex. R. App. P. 47.2(b).











[1] The State concedes in its brief that some of the
evidence seized in the motel room constituted circumstantial evidence that
Brown had impersonated a police officer. 
For this reason, we address the motion to suppress issue.