Opinion issued November 16, 2006 








 










In The
Court of Appeals
For The
First District of Texas
 

 
 
NO. 01-05-00998-CR
__________
 
CHARLES UKANWA OJO, Appellant
 
V.
 
THE STATE OF TEXAS, Appellee
 

 
 
On Appeal from County Court at Law No. 1
Fort Bend County, Texas
Trial Court Cause No. 115301
 

 
 
MEMORANDUM OPINION
          A jury found appellant, Charles Ukanwa Ojo, guilty of the offense of 
terroristic threat of a family or household member


 and the trial court assessed his
punishment at confinement for 125 days. In three points of error, appellant contends
that the evidence is legally and factually insufficient to support his conviction, the
trial court erred in denying him an evidentiary hearing on his motion for new trial,
and his trial counsel provided him ineffective assistance of counsel. 
          We affirm.
Factual and Procedural Background
          Fort Bend County Sheriff’s Deputy J. Tabares testified that, on December 31,
2004, he was dispatched to the home of the complainant, Comfort Ojo, in response
to a disturbance call. Tabares found the complainant “hysteric, crying, breathing
heavily, and unable to answer [his] questions.” 
          Fort Bend County Sheriff’s Deputy Pocasangre testified that he was dispatched
to the home after receiving a disturbance call and that he arrived a few minutes after
Tabares. When Pocasangre arrived, he found the complainant “to be upset [and]
crying,” and he also met with the complainant’s son, who appeared calm. Pocasangre
observed that the screen on the televison was broken and that several picture frames
were on the ground. Appellant was no longer at the residence. Pocasangre recorded
an interview with the complainant and prepared a report. 
          The complainant told Pocasangre that on the previous day, appellant, her
husband, “came over to the house and threatened to kill her” and then left the home. 
Appellant returned the next day to their home and started an argument. As appellant
was removing his property, the argument “escalated into a point where [appellant]
started destroying some of the property.” The audio tape of Pocasangre’s interview
of the complainant was played to the jury.
          The complainant testified that on December 30, 2004, she asked appellant to
discuss their marital problems and also requested his help in paying household bills. 
The conversation escalated, and appellant told the complainant that he was “not
interested’ in their marriage and that he did not have any money. Appellant became
angry, stood up, started screaming, and both the complainant and appellant started
arguing. Appellant told the complainant he was going to leave, and then he went
upstairs and started moving his things. Appellant told the complainant that “I’m
going to make sure when I’m finished with you, you’ll be crawling on your knees” 
and that he would take her life in a fashion similar to “the California incident that
happened when the man dragged his wife on the truck until her head severed from her
body.” The complainant was “afraid for her life.” Appellant left the house and told
their teenage son, who was in the house at the time, that he would return later to get
the rest of his things.
          The complainant called a locksmith the next morning and had the home’s locks
changed because she was in fear of what appellant would do to her. Appellant
returned to the home the next day, and the complainant gave her son permission to
open the door. Appellant came into the house and got the rest of his possessions from
the garage. The complainant was still afraid, and initially appellant and the
complainant did not speak to each other. However, appellant came back into the
house from the garage and began yelling about his missing tennis racket. The
complainant told appellant that she had no idea where his tennis racket was, and
appellant said “you get it down before things start flying and start smashing things.” 
Appellant then grabbed a wall clock and some framed photographs and “everything
started to fly into the television.” The complainant “ran away” because she “didn’t
know if [appellant] was going to hit or bust something over [her] head” and because
appellant had threatened her the night before. The complainant ran outside
screaming, asked for help from some garbage men, and told them to call for
emergency assistance because her husband was trying to kill her. The complainant
then called for emergency assistance herself because she was afraid for her life and
she had not seen appellant exhibit “this kind of attitude” during their marriage. The
complainant felt that appellant meant what he said when he threatened to kill her the
night before, and his behavior indicated that he intended to carry out his threat. As
she called for emergency assistance, appellant told her that he would come back and
get her. He then drove off in his truck. 
          On cross-examination, the complainant agreed that she was upset by appellant
telling her that he did not want to be married to her. She also agreed that appellant
did not get physical with her on the night of the offense and did not throw anything
at her. The complainant also conceded that in April 2005, after the offense, she called
appellant on the phone and asked him to buy a basketball hoop for their son’s
birthday.
          Fort Bend County Sheriff’s dispatcher Delvina Palacios testified that she
answered the emergency telephone call from the complainant, and the recording of
the call was then played to the jury.
          Appellant testified that on December 30, 2004, the complainant asked appellant
to talk about their marriage and that “she was so upset” “she was almost shaking
because she was mad.” Appellant and the complainant both started shouting at one
another, and appellant told the complainant that he did not “want to be in the
marriage.” Appellant denied that he told the complainant that he was going to kill
her. In fact, it was the complainant who told appellant that “she would kill [him] or
ruin [his] life.” Appellant then packed his belongings, stored them in the garage, left
the house, and went to a hotel.
          When appellant returned the next morning to pick up his belongings, he found 
that the garage door lock had been changed. He knocked on the front door, and after
his son let him inside the home, he “went straight to the garage.” Appellant did not
talk to or make any threatening moves toward the complainant. However, when
appellant went into the garage, he noticed that someone had gone through his boxes
and that his tennis racket was missing. Appellant then went back inside the house
and asked his wife about his racket. The complainant got up, went into the bedroom
without saying anything, came out of the bedroom, and “ran toward where she was
sitting on the couch [and was] looking for something.” Appellant became afraid. The
complainant found what she was looking for and ran from the house. 
          Appellant then “went—after her trying to leave” because “she had something
she took from me” and he “thought she was going to ignore me and just run away.” 
As he “was trying to get to her” and “stop her” to answer his question, he tripped over
a picture frame that was on a coffee table, and the frame hit the television screen and
broke it. Appellant did not touch or make a threatening move toward the
complainant, and the complainant was not in the house when the television was
broken. When appellant went outside, he saw the complainant, who had a cell phone,
and she told him that she was calling for emergency assistance. In regard to the call,
appellant stated that the complainant “can act.” Appellant did not make any
threatening moves toward the complainant during her phone call, and he took his last
box and left the house. Appellant explained that the complainant had a “very high
temper” and that she had been fired more than three times for arguing with
coworkers. Appellant also stated that he is afraid of his wife because “she’s very
combative, she’s ready to fight at anytime anywhere,” and she threatened to blackmail
him with his criminal history. On cross-examination, appellant reiterated that the
television broke when he tripped on the picture frame as he was trying to jump over
the coffee table.    
Legal and Factual Sufficiency
          In his third point of error, appellant agues that the evidence is legally and
factually insufficient to support his conviction because the complainant’s testimony
that appellant’s threats made her afraid for her life “could not possibly be believed as
being true.” 
          We review the legal sufficiency of the evidence by viewing the evidence in the
light most favorable to the verdict to determine whether any rational trier of fact
could have found the essential elements of the offense beyond a reasonable doubt.
Vodochodsky v. State, 158 S.W.3d 502, 509 (Tex. Crim. App. 2005). The trier of fact
is the sole judge of the weight and credibility of the evidence. Margraves v. State,
34 S.W.3d 912, 919 (Tex. Crim. App. 2000). Thus, when performing a legal
sufficiency review, we may not re-evaluate the weight and credibility of the evidence
and substitute our judgment for that of the fact finder. Dewberry v. State, 4 S.W.3d
735, 740 (Tex. Crim. App. 1999). We must resolve any inconsistencies in the
evidence in favor of the verdict. Curry v. State, 30 S.W.3d 394, 406 (Tex. Crim. App.
2000).
          In a factual sufficiency review, we view all the evidence in a neutral light, both
for and against the finding, and set aside the verdict if proof of guilt is so obviously
weak as to undermine confidence in the jury’s determination, i.e., that the jury’s
verdict seems “clearly wrong and manifestly unjust,” or the proof of guilt, although
legally sufficient, is nevertheless against the great weight and preponderance of the
evidence. Watson v. State, No. PD-469-05, 2006 WL 2956272, at *10 (Tex. Crim.
App. Oct. 18, 2006). In performing a factual-sufficiency review, we are to give
deference to the fact finder’s determinations, including the determinations involving
the credibility and demeanor of witnesses. Cain v. State, 958 S.W.2d 404, 407 (Tex.
Crim. App. 1997). We may not substitute our judgment for the fact-finders. Watson,
2006 WL 2956272, at *10.
          A person commits the offense of terroristic threat of a family or household
member if “he threatens to commit any offense involving violence to any person or
property with intent to . . . place any person in fear of imminent serious bodily injury
. . . [and] the offense is committed against a member of the person’s family or
household.” See Tex. Pen. Code Ann. § 22.07(a)(2), (c)(1) (Vernon Supp. 2005).
          Here, Deputy Pocasangre testified that he was dispatched to the residence after
receiving a disturbance call and that the complainant told him that on the previous
day, appellant threatened to kill her and that appellant returned the following day and
began an argument and started destroying property.
          The complainant testified that following her discussion with appellant
concerning marital problems, appellant became angry and told her that when he was
“finished with [her],” she would “be crawling on [her] knees” and that he would take
her life in a fashion similar to an incident in California when a man “dragged his
wife” behind a truck “until her head severed from her body.” The complainant
testified that she was “afraid for her life” and changed the locks on her home because
she was in fear of what appellant would do to her. The complainant stated that when
appellant returned to the house the day after making the above threats, he began
yelling and destroying property and that she ran outside and called for emergency
assistance based on appellant’s threats. The complainant stated that she was afraid
for her life and that appellant’s behavior indicated that he intended to carry out his
threat. Viewing the evidence in the light most favorable to the jury’s verdict, we
conclude that a rational trier of fact could have found the essential elements of the
offense beyond a reasonable doubt. Accordingly, we hold that the evidence is legally
sufficient to support appellant’s conviction.
          In regard to the factual sufficiency review, appellant cites the complainant’s
testimony that, on the day following the threat, she gave her son permission to open
the door and let appellant inside the home. Appellant contends, based on this
evidence, that a rational trier of fact could not believe that the complainant was
actually afraid for her life. However, we conclude that, to the extent that this fact
could permit a fact finder to question the complainant’s testimony in regard to
whether appellant threatened the complainant, the fact finder was entitled to resolve
this credibility issue against appellant. Cain, 958 S.W.2d at 408–09. We conclude,
viewing the evidence neutrally, that the evidence is not so weak that the verdict is
clearly wrong or manifestly unjust or that the proof of guilt is against the great weight
and preponderance of the evidence. Accordingly, we hold that the evidence is
factually sufficient to support appellant’s conviction.
          We overrule appellant’s third point of error. 
Evidentiary Hearing on Motion for New Trial
          In his first point of error, appellant argues that the trial court erred in denying
him an evidentiary hearing on his motion for new trial because he had an absolute
right to one as the motion alleged matters that were not determinable from the record.
          In his motion for new trial, appellant asserted that the evidence was insufficient
to support his conviction and that he received ineffective assistance of counsel based
on “the following facts,” which he contended were “outside the record”: 
[c]ounsel did not consult with the defendant sufficiently before trial to
be able to effectively represent the defendant; [a]ttorney would not meet
with the defendant anywhere but at the court house where it was not
possible for the attorney and client to talk in an atmosphere that would
facilitate the attorney client relationship and allow the defendant to
openly confer with the attorney; [t]he attorney for the defendant did not
investigate the case or any of the evidence in the case including . . . a
911 audio tape; [t]he attorney for the defendant did not proffer the
defenses as requested by the defendant; attorney for the defendant
agreed to a stipulation to not allow any evidence of prior marital
disputes of the parties without consulting with the defendant; [a]ttorney
for the defendant never discussed with the defendant any strategies or
plans for the case; [and] [a]ttorney did not ask any questions of the two
sheriff’s deputies without any type of trial strategy. 
 
          Appellant’s appointed attorney on appeal, Lynn Foster, attached to the motion
for new trial an affidavit in which she stated, “My name is Lynn Foster. I am the
attorney for [appellant] in this cause. I am over the age of 18 years, have never been
convicted of a felony, and am competent to make this affidavit. ‘See attached
affidavit.’” However, there is no additional affidavit attached to Foster’s affidavit,
and her affidavit does not include testimony concerning any specific facts in the
motion or any other facts concerning matters that were not determinable from the
record.


 
          At the beginning of the motion for new trial hearing, and prior to the
presentation of any additional evidence, the State argued that appellant’s counsel did
not swear to any facts in the motion that were outside the record. Appellant’s
attorney responded that, despite the wording of the affidavit, he “was swearing to the
contents of the motion,” not another affidavit.


 At the conclusion of argument, the
trial court stated that “the pleadings are insufficient” and denied the motion for new
trial. The trial court then permitted appellant to present “a bill.”



          We review a trial court’s refusal to hold an evidentiary hearing on a motion for
new trial for an abuse of discretion. See, e.g., Reyes v. State, 849 S.W.2d 812, 816
(Tex. Crim. App. 1993). When a defendant presents a motion for new trial that raises
matters not determinable from the record upon which the defendant could be entitled
to relief, a trial court abuses its discretion in failing to hold a hearing. Id. However,
the right to a hearing on a motion for new trial is not absolute. Reyes, 849 S.W.2d at
815. Rather, as a prerequisite to obtaining a hearing, a motion for new trial must be
supported by an affidavit specifically showing the truth of the grounds for attack. 
Martinez v. State, 74 S.W.3d 19, 21 (Tex. Crim. App. 2002); King v. State, 29 S.W.3d
556, 569 (Tex. Crim. App. 2000). “The supporting affidavit must reflect that
reasonable grounds exist for holding that such relief could be granted.” Martinez, 74
S.W.3d at 21 (citing Jordan v. State, 883 S.W.2d 664, 665 (Tex. Crim. App. 1994)). 
An affidavit made by someone without knowledge of the facts, or an affidavit that is
conclusory or that is unsupported by facts, is not sufficient to put the trial court on
notice that reasonable grounds for relief exist. See Reyes, 849 S.W.2d at 816; Lempar
v. State, 191 S.W.3d 230, 235 (Tex. App.—San Antonio 2005, pet. ref’d); Flores v.
State, 18 S.W.3d 796, 798 (Tex. App.—Austin 2000, no pet.).
          Here, the affidavit provided by appellant’s counsel merely refers to another
affidavit, which is not attached. The affidavit itself is wholly unsupported by facts
and does not reflect that it is made by someone with knowledge of the facts of the
case or the grounds set forth in the motion for new trial. Thus, it was not sufficient
to put the trial court on notice that reasonable grounds for relief existed. 
Accordingly, we hold that the trial court did not abuse its discretion in denying
appellant an evidentiary hearing on his motion for new trial, and we deny appellant’s
request to abate the appeal.
          We overrule appellant’s first point of error.
Ineffective Assistance
          In his second point of error, appellant argues that his trial counsel provided
ineffective assistance because he did not investigate the case, was not aware of the
existence of the emergency call tape, and did not ask questions of the State’s “police
officer witnesses.” 
          The standard of review for evaluating claims of ineffective assistance of
counsel is set forth in Strickland v. Washington, 466 U.S. 668, 687, 104 S. Ct. 2052,
2064 (1984). Strickland requires a two-step analysis whereby appellant must show
both that (1) counsel’s performance fell below an objective standard of
reasonableness and (2) but for counsel’s unprofessional error, there is a reasonable
probability that the result of the proceedings would have been different. Strickland,
466 U.S. at 687, 104 S. Ct. at 2064; Vasquez v. State, 830 S.W.2d 948, 949 (Tex.
Crim. App. 1992). Strickland defines reasonable probability as a “probability
sufficient to undermine confidence in the outcome.” 466 U.S. at 694, 104 S. Ct. at
2068. 
          In reviewing counsel’s performance, we look to the totality of the
representation to determine the effectiveness of counsel, indulging a strong
presumption that his performance falls within the wide range of reasonable
professional assistance or trial strategy. Thompson v. State, 9 S.W.3d 808, 813 (Tex.
Crim. App. 1999). A claim of ineffective assistance must be firmly supported in the
record. Id. 
          Here, although appellant filed a motion for new trial, the affidavit attached to
the motion was deficient, and the trial court did not conduct an evidentiary hearing
and permit appellant to present evidence on matters not determinable from the record.
To the extent that appellant sought to assert claims of ineffective assistance that were
not apparent on the face of the record and instead were only supportable by reference
to matters outside the record, appellant has necessarily failed to meet his burden of
proving ineffective counsel. 
          We must now determine whether appellant’s claims of ineffective assistance
are firmly supported in the record before us. We note that because of the presumption
that counsel’s actions and decisions were reasonably professional or were motivated
by sound trial strategy, it is extremely difficult to show that trial counsel’s
performance was deficient when there is no proper evidentiary record developed at
a hearing on a motion for new trial. See Sudds v. State, 140 S.W.3d 813, 819 (Tex.
App.—Houston [14 Dist.] 2004, no pet.) (citing Bone v. State, 77 S.W.3d 828, 830
(Tex. Crim. App. 2002)). In regard to appellant’s specific claim that his counsel was
ineffective because he failed to properly investigate the case and did not ask questions
of the State’s “police officer witnesses,” the Texas Court of Criminal Appeals has
stated that “[o]ften, the decision to not cross-examine a witness is the result of
wisdom acquired by experience in the combat of trial.” Miniel v. State, 831 S.W.2d
310, 324 (Tex. Crim. App. 1992) (quoting Coble v. State, 501 S.W.2d 344, 346 (Tex.
Crim. App. 1973)). Our review of the record reveals that, during trial, Batchan
focused on attacking the complainant’s testimony by extensively cross-examining her
and questioning the credibility of her story. Batchan did not seek to challenge the
contents of the statements that she made to the State’s other witnesses, but instead
contended that the complainant was acting at the time she made those statements and
the emergency call. Thus, Batchan elected to specifically address the emergency call
with appellant rather than with the dispatcher. Batchan could have reasonably
concluded that it would not have been beneficial to ask the dispatcher about her
impression of the complainant during the phone call or to question the deputies
concerning their personal observations at the residence. Instead, Batchan could have
elected to rely on the direct testimony of appellant, who categorically denied that he
threatened the complainant, testified in great detail concerning the sequence of
events, and described his wife as a combative person who had a history of engaging
in arguments with co-workers.
          In regard to the audio tape of the emergency call, the record does establish that
Batchan elected not to listen to the audio tape until trial. But the record also reveals
that, at the time the complainant called for emergency assistance while standing
outside her home, appellant was standing at the door of their house and was aware
that the complainant was making the call. When appellant’s counsel questioned
appellant concerning “the noise and crying and stuff” that apparently was audible on
the tape and the fact that the tape reflected that the complainant was upset, appellant
asserted that the complainant “[could] act.” 
          Appellant also said he “saw [the complainant] talking to the cops” and that the
complainant “likes to call the cops.” Appellant could have conveyed to Batchan the
general substance of the complainant’s comments as well as the complainant’s tone
and demeanor during the call, and thus Batchan could have been aware of the general
contents of the audio tape before trial. Again, the record indicates that Batchan
focused his trial strategy on the theory that the complainant was merely acting when
speaking both to the deputies and the dispatcher and, thus, did not actually feel
threatened by appellant. Appellant portrayed his wife as a manipulative person who
fabricated her story of the alleged threats because appellant wanted to end their
marriage. Appellant testified that the complainant threatened to blackmail appellant
and ruin appellant’s life and that he was afraid of the complainant. Appellant also
emphasized that the complainant’s testimony should not be viewed as credible
because she let appellant inside their home the very next day after the alleged threat
and because she continued to communicate with him during the months after the
alleged offense regarding their son. Finally, we note that other than the statements
made by the complainant to the dispatcher, the audio tape of the emergency call does
not contain any evidence that appellant threatened the complainant’s life.


 We
conclude that appellant’s claims of ineffective assistance are not firmly supported in
the record. Accordingly, we hold that appellant has not established that his trial
counsel’s performance fell below an objective standard of reasonableness.
          We overrule appellant’s second point of error.
Conclusion
          We affirm the judgment of the trial court.
 
 
                                                                        Terry Jennings
                                                                        Justice

Panel consists of Justices Nuchia, Jennings, and Higley.

Do not publish. Tex. R. App. P. 47.2(b).